General TACKETT, Jr., Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2013–SC–000208–MR.

Supreme Court of Kentucky.

Oct. 23, 2014.

Molly Mattingly, Department of Public Advocacy, for appellant.

Jack Conway, Attorney General, James Hays Lawson, Assistant Attorney General, for appellee.

## OPINION OF THE COURT BY JUSTICE KELLER

KELLER, Judge.

The Carter Circuit Court convicted General Jackson Tackett, III (Tackett) of two counts of first degree sexual abuse and three counts of first degree sodomy of two victims, Sarah and Nicholas.[1] The court

sentenced Tackett to thirty (30) years' imprisonment. He appeals his sentence as a matter of right under Ky. Const. § 110(2)(b). Tackett raises eight issues on appeal. He argues that: (1) he was unduly prejudiced by the irrelevant and bolstering testimony of Dr. Drema Hunt and Dr. Gail Fineburg; (2) he was unduly prejudiced by introduction of Kentucky Rule of Evidence (KRE) 404(b) evidence; (3) he was unduly prejudiced by Sarah's victim impact testimony and by the bolstering testimony of Sarah and Nicholas; (4) he was unduly prejudiced by the bolstering testimony from other witnesses; (5) he was unduly prejudiced by the admission of a picture Nicholas drew in elementary school; (6) the trial court violated his right to a fair trial by failing to excuse a juror; (7) he was denied a right to a speedy trial; and (8) he was denied a fair trial because of the cumulative impact of all of these alleged errors. The Commonwealth responds that Dr. Hunt's and Dr. Fineburg's testimony does not amount to palpable error, and that there was no improper KRE 404(b) evidence; furthermore, the Commonwealth argues that the six remaining issues should be brought under an ineffective assistance of counsel claim pursuant to RCr 11.42. Although this Court would like to see briefs from the Commonwealth which actually address all the issues raised on appeal, we still find no merit in Tackett's other arguments. Consequently, having reviewed the record and the parties' arguments, we affirm.

## I. FACTS.

In June 2011, Tackett returned to the United States from his then home in Guatemala. Upon his arrival, he was arrested and charged with seven counts of sex crimes against two alleged victims, his son,

---

1. We have chosen pseudonyms to protect the identity of the victims.

Nicholas, and Sarah, a female friend of Tackett's children. At the time of trial, Nicholas was 20 years old and Sarah was 18 years old. The events giving rise to the charges occurred approximately ten years prior to trial. The Commonwealth accused Tackett of one count each of first degree sexual abuse, first degree rape and first degree sodomy as to Sarah; and one count of first degree sexual abuse and three counts of first degree sodomy as to Nicholas.

Sarah, the Commonwealth's first witness, testified that her grandmother, who lived on the same street as Tackett, took care of her after school when she was approximately seven (7) years old. As a result, Sarah became friends with Tackett's children, especially Tackett's daughter, Abigail. Sarah testified that she began visiting the Tackett children at their home, but the visits stopped when Sarah moved to Paintsville, Kentucky, when she was approximately nine (9) years old.

Sarah testified about four sexual encounters involving Tackett. The first occurred when she spent the night at Tackett's house with Abigail. Abigail had told Sarah that they were not to leave Abigail's room during the night, but Sarah, who was thirsty, went to the kitchen to get a drink of water. Tackett walked into the kitchen and told Sarah that he would have to punish her for leaving Abigail's room. Sarah testified that Tackett then raped her. Sarah stated it felt like she was being ripped apart but she could not remember any other details about this encounter. A second encounter also took place in the kitchen, when Tackett put his penis in Sarah's mouth. A third encounter took place in "a room with dolls and pink" when Tackett touched her between the legs with his hand. The final encounter Sarah testified about took place in the basement, where Tackett forced Nicholas to sodomize

her by putting his penis in her mouth and to rape her.

Sarah testified that she did not tell anyone about these incidents until a few summers before the trial, when she told her mother. At some point, the police became involved and Sarah was ultimately referred to Hope's Place, a children's advocacy center in Ashland, Kentucky, where she reluctantly spoke with a forensic interviewer, Jennifer Kelly.

On cross-examination, Sarah testified that previous allegations of sexual abuse arose when her aunt noticed a difference in her as a person, and her aunt suspected Sarah's father had molested her. At that time, Sarah saw a psychologist and told the psychologist her father never hurt her.

After Sarah testified, the Commonwealth called Nicholas to testify. Nicholas testified he was five (5) years old the first time Tackett sexually abused him. Nicholas said he was asleep in his room when Tackett came and got in bed with him, reached down his pants and began stroking him. According to Nicholas, Tackett then inserted his fingers into Nicholas's rectum. This lasted for ten to fifteen minutes and then Tackett told Nicholas it was just a game and not to tell anyone. Nicholas testified these acts continued once a night or every other night for "quite a while."

Nicholas further testified that when he was seven (7) years old Tackett came in his room and anally sodomized him. Nicholas testified he knew what happened because "it" felt bigger and hurt. Tackett told him if he screamed it would get worse, so Nicholas never made any noise. Nicholas testified that he was afraid to tell anyone because he thought they wouldn't believe him, and they would shun him.

Nicholas also recalled two other specific acts. One occurred when Tackett took

him and Sarah to the basement. According to Nicholas, Tackett stated that he was going to abuse Nicholas's little sister, Juliana, so Nicholas and Sarah offered to take her place. Tackett then made Sarah and Nicholas perform oral sex on him. The second incident occurred at a Holiday Inn when Tackett and Nicholas's mother were getting divorced. According to Nicholas, he and Tackett went for a swim in the hotel's pool after which Tackett anally sodomized him in the hotel room shower.

Nicholas testified that, when he was approximately twelve years old, his parents' divorce was final and Tackett moved to Guatemala, thus putting an end to the abuse. Nicholas told two trusted friends about these incidents; however, he did not tell any adults until he turned 18 years old, when he told his mother, whereupon the police and personnel at Hope's Place became involved. At Hope's Place, Nicholas underwent a recorded forensic interview, which was played to the jury by agreement of the parties.

In addition to the testimony from Sarah and Nicholas, the Commonwealth offered testimony from: Dr. Hunt and Dr. Fineburg, two physicians who examined Sarah and Nicholas at Hope's Place; Jennifer Kelly, a forensic interviewer from Hope's Place; Detective Chris Fraiser with the Kentucky State Police Electronic Crimes Branch; Regina Jackson, a guidance counsel at Nicholas's former elementary school; Sarah's and Nicholas's mothers; and Detective Chris Carter, the lead investigator.

Tackett did not present any evidence. After an hour and twenty (20) minutes of deliberation, the jury returned a verdict, finding Tackett guilty of: first degree sexual abuse of Sarah by touching her between the legs with his hand while in the room with dolls and pink in the Tackett home; first degree sexual abuse of Nicholas by stroking Nicholas's penis while in

Nicholas's bedroom; first degree sodomy of Sarah by placing his penis in Sarah's mouth while in the kitchen of the Tackett home; and first degree sodomy of Nicholas by placing his penis in the anus of Nicholas while in Nicholas's bedroom. The jury acquitted Tackett of first degree rape of Sarah in the Tackett kitchen and of first degree sodomy of Nicholas while in a room at the Holiday Inn.

## II. STANDARD OF REVIEW.

▪ Tackett did not properly preserve any of his arguments for review. Therefore, we review them for palpable error. Kentucky Rule of Criminal Procedure (RCr) 10.26.

> We will reverse under the palpable error standard only when a "manifest injustice has resulted from the error." RCr 10.26. "[T]he required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky.2006). When we engage in palpable error review, our "focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process.

*Baumia v. Commonwealth,* 402 S.W.3d 530, 542 (Ky.2013).

## II. ANALYSIS.

With the above standard in mind, we address each of Tackett's arguments on appeal.

### A. Testimony from Dr. Hunt and Dr. Fineburg.

Tackett argues that he was unduly prejudiced by irrelevant and impermissible bolstering hearsay testimony from the Commonwealth's witnesses, Dr. Hunt and Dr. Fineburg. The Commonwealth admits

that error occurred but argues that any error was not palpable. We agree with the Commonwealth, although for different reasons.

### (1) Dr. Hunt's Testimony.

■ Dr. Hunt examined Nicholas for Hope's Place on December 29, 2011, when Nicholas was 19 years old, and Dr. Hunt issued a report regarding her findings. At the beginning of Dr. Hunt's testimony, the Commonwealth moved to introduce her report into evidence. The trial court asked Tackett's counsel if he had any objections to the admission of the report; counsel responded that he did not; and the court admitted the report into evidence. The report stated that Nicholas told Dr. Hunt he had been sexually abused and that the perpetrator was his "dad." Counsel for Tackett, who had a copy of the report, was, or should have been, aware of its contents before he affirmatively waived any objection to its admission into evidence. After admitting the report into evidence, the Commonwealth asked Dr. Hunt what Nicholas had told her. Dr. Hunt testified that Nicholas stated that he had been sexually abused and that he had identified the perpetrator. The Commonwealth asked who Nicholas had identified as the perpetrator, and Dr. Hunt responded that Nicholas had said it was, "my dad." Tackett's counsel did not object to this line of questioning or to Dr. Hunt's response. Tackett now argues that this testimony by Dr. Hunt was improper hearsay and bolstering, resulting in undue prejudice and necessitating a new trial.

Generally, statements made by witnesses outside of court are excluded as hearsay when offered to prove the truth of the matter asserted. KRE 801(c) and 802. However, a physician is permitted to testify about statements made by a patient "for purposes of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis." KRE 803(4).

■ This exception to the hearsay exclusionary rule does not open the door to testimony by physicians to all conversations with patients. In *Colvard v. Commonwealth*, 309 S.W.3d 239, 244 (Ky.2010), we held that the hearsay exception of KRE 803(4) is founded upon the notion that a declarant seeking treatment has a selfish motive to be truthful because the effectiveness of medical treatment depends upon the accuracy of the information provided. However, we also held that physician testimony regarding the identity of a perpetrator is not relevant to the treatment or diagnosis of a sexual abuse victim and, therefore, does not fall within the KRE 803(4) exception to the hearsay rule.

In *Hoff v. Commonwealth*, 394 S.W.3d 368 (Ky.2011), we held that it is palpable error to permit a physician to testify about the identification of the perpetrator by a child victim of sexual abuse. *Id.* at 373. We did so because it is highly prejudicial for a doctor or other professional to repeat the hearsay statements made by a child-victim who might otherwise be less believable than a medical professional. *Id.* Tackett argues that, based on our holdings in *Colvard* and *Hoff*, the admission of Dr. Hunt's testimony was palpable error, mandating reversal of his conviction.

In response, the Commonwealth argues that Tackett's case differs from *Colvard* and *Hoff* because of the ages of the victims in those cases. In *Hoff* the victim was 12 when the acts occurred and 14 at the time of trial. In *Colvard*, the victims were six and seven when the acts occurred and

seven or eight at the time of trial.[2] According to the Commonwealth, the identification by a physician of the perpetrator in those cases was inadmissible because it impermissibly bolstered the often unreliable testimony of young children. Here, the Commonwealth argues that, because Nicholas was an adult, Dr. Hunt's identification of Tackett as the perpetrator did not bolster the unreliable testimony of a young child. Rather, it confirmed the more reliable testimony of another adult.

While we disagree with the Commonwealth's argument that the age of a victim at the time of trial is dispositive for analysis under *Colvard* and *Hoff,* we nonetheless affirm. The trial court specifically asked Tackett's counsel if he had any objection to the admission of Dr. Hunt's report which identified Tackett as the perpetrator, and he stated that he did not. Dr. Hunt then testified, reiterating what the report stated—that Nicholas identified his father as the perpetrator. Tackett's counsel did not object to this testimony either. In the face of the explicit statement that he had no objection to the entry of the report into evidence and a failure to object to Dr. Hunt's testimony, Tackett cannot now claim that Dr. Hunt's testimony rose to the level of palpable error.

In support of our holding, we look to our case law regarding invited error, because it is instructive if not directly on point or dispositive. In *Quisenberry v. Commonwealth,* 336 S.W.3d 19 (Ky.2011), two defendants were convicted for their roles in a robbery and murder. On appeal, one defendant alleged that the facts failed to support his convictions of additional charges. *Id.* at 37. However, during the trial he had tendered jury instructions to the judge and referred to evidence which he believed supported instructions on the charges. *Id.* Therefore, any error in in-

structing the jury was not merely unpreserved but invited by the defendant. *Id.* Because a party is generally estopped from arguing an invited error on appeal, we held that the defendant was precluded from arguing that the court erred by instructing the jury as he wanted. *Id.*

Similarly, in *Mullins v. Commonwealth,* 350 S.W.3d 434 (Ky.2011), Mullins was convicted of murder and tampering with evidence and of being a persistent felony offender. While discussing jury instructions, the Commonwealth stated that it wanted a murder instruction and a lesser included offense instruction on manslaughter in the first degree. Counsel for Mullins objected, stating that his client did not want any lesser included offense instructions. The court determined that a manslaughter instruction was appropriate. Counsel for Mullins, while not waiving his objection, then stated that any manslaughter instruction could not be based on extreme emotional disturbance because there was no evidence to support such an instruction. The court agreed and only included a manslaughter instruction based on a theory of intent to cause serious physical injury. *Id.* at 438.

On appeal, Mullins argued that the trial court erred by not including an extreme emotional disturbance manslaughter instruction. *Id.* We held that the issue was not only unpreserved, but that it had been waived. *Id* at 438–39. In doing so, we noted that there is a difference between " 'forfeited errors, which are subject to plain [or palpable] error review, and waived errors, which are not ... [and] ha[ve] held that invited errors that amount to a waiver, *i.e.* invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review.' " *Id.* at 439 (citations omitted).

2. In *Hoff,* the trial took place fifteen (15) months after the date the acts occurred.

The aforementioned cases stand for the proposition that a party cannot ask a trial court to do something and, when the court does it, complain on appeal that the court erred. Although the cited cases deal with jury instructions, the proposition has broader application. When, as here, a party not only forfeits an error by failing to object to the admission of evidence, but specifically waives any objection, the party cannot complain on appeal that the court erroneously admitted that evidence. Here, Tackett explicitly stated that he had no objection to the admission of Dr. Hunt's report, which stated that Tackett was the perpetrator. Thus, he explicitly waived any objection to the admission of that evidence, whether by way of the report or through Dr. Hunt's testimony about the report's contents. Because Tackett waived this error, it, like the alleged errors in *Quisenberry* and *Mullins,* is not subject to review.

■ Tackett also argues that Dr. Hunt's testimony regarding Nicholas's hemorrhoidal tag, which could support a finding of sexual abuse, was irrelevant and unduly prejudicial. The Commonwealth argues that the testimony was relevant because it made anal sodomy more probable than less probable without the evidence, and was thus admissible under KRS 401. That is not necessarily accurate, because Dr. Hunt testified the tag could be a result of other causes unrelated to anal sodomy. Regardless of this testimony's relevance, Tackett cannot show what prejudice he may have suffered or a probability of a different result or error so fundamental as to threaten his entitlement to due process of law. *Martin,* 207 S.W.3d at 3. As a result, Tackett's argument as to this issue also fails.

### (2) Dr. Fineburg's Testimony.

■ Dr. Fineburg supervised but did not conduct the examination of Sarah at Hope's Place. At a bench conference prior to Dr. Fineburg's testimony, the parties agreed that, although Dr. Fineburg had not actually conducted Sarah's examination, she could testify about the examination and its results. During this conference, Tackett's counsel specifically stated that he realized Dr. Fineburg's testimony would contain hearsay; that he and the Commonwealth's attorney had discussed the issue; and that he was "okay with it."

Following the bench conference, Dr. Fineburg testified that Sarah told her that she had been vaginally penetrated at the age of six; however, Dr. Fineburg's examination revealed no abnormal findings. Furthermore, Dr. Fineburg testified that, given the lapse in time between the reported penetration and the examination, she would not expect to find any abnormalities. We note that Dr. Fineburg did not testify that Sarah had identified the perpetrator.

Tackett now argues that Dr. Fineburg's testimony should have been excluded because: it contained impermissible hearsay; it impermissibly bolstered Sarah's testimony; and it was not relevant. As noted above, issues now being raised by Tackett with regard to hearsay and Dr. Fineburg's testimony are not only unpreserved but were specifically waived by Tackett's counsel. It appears this waiver was in keeping with Tackett's strategy to discount Sarah's story by showing a complete lack of physical evidence to support her allegations. Therefore, to the extent admission of Dr. Fineburg's testimony was error, Tackett's counsel invited that error, and we need not further discuss its admissibility.

### B. 404(b) Evidence.

KRE 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity there-

with." Tackett argues the Commonwealth impermissibly elicited such evidence in the form of: (1) the Commonwealth's assertion in opening statement that Tackett had threatened to harm Sarah, Nicholas, and their parents; (2) Sarah's testimony about an incident that occurred in the basement of the Tackett home that was not included in the indictment or the jury instructions; (3) Nicholas's testimony about an incident in the basement involving Sarah that was not included in the jury instructions; (4) Sarah's testimony that one time she thought she saw a flash from a camera when Tackett was not charged with having any photographs or with using a minor in a sexual performance; and (5) Nicholas's testimony that Tackett sexually abused him "once a night, or once every other night for quite a while" when Tackett was not indicted for those multiple acts. These fall into three categories: (1) assertions by the Commonwealth's attorney in opening statement; (2) testimony about unindicted acts; and (3) testimony about acts not included in the jury instructions. None of these alleged errors is preserved; therefore, we analyze them for palpable error.

**(1) Opening Statement.**

■ What is said in opening statement is not evidence. *Wheeler v. Commonwealth*, 121 S.W.3d 173, 180 (Ky.2003). Therefore, anything the Commonwealth said in opening statement could not run afoul of KRE 404(b), which is an evidentiary rule. When the Commonwealth pointed this out in its brief, Tackett changed his argument in his reply brief, arguing the Commonwealth's statements amounted to prosecutorial misconduct. This change in argument, although it has some merit, is not persuasive.

■ We grant attorneys wide latitude in making opening statements. *Id.* However,

RCr 9.42(a) requires the prosecutor in his opening statement to "state to the jury the nature of the charge and the evidence upon which the Commonwealth relies to support it." Thus, "[t]he only legitimate purpose of an opening statement is so to explain to the jury the issue they are to try that they may understand the bearing of the evidence to be introduced." *Lickliter v. Commonwealth*, 249 Ky. 95, 60 S.W.2d 355, 357 (1933); see *Fields v. Commonwealth*, 12 S.W.3d 275, 281 (Ky.2000). Further, "it is never proper in an opening statement for counsel to argue the case or to give his personal opinions or inferences from the facts he expects to prove." *Turner v. Commonwealth*, 240 S.W.2d 80, 81 (Ky.1951).

*Kiper v. Commonwealth*, 399 S.W.3d 736, 748 (Ky.2012).

Based on the preceding, the assertions by the Commonwealth's attorney in opening statement could have been deemed inappropriate. However, because Tackett did not object to them, he is required to show that those statements affected the outcome. The objected-to statements by the Commonwealth were short and not unduly emphasized. Furthermore, other than noting the comments, Tackett has failed to establish that, in the context of this case, they had any impact on the jury verdict. Thus, we discern no palpable error.

**(2) Testimony About Unindicted Acts.**

■ With regard to Sarah, the indictment charged Tackett with committing one count each of first degree sexual abuse, rape, and sodomy between the years 2002 and 2004. With regard to Nicholas, the indictment charged Tackett with committing one count of sexual abuse and three counts of sodomy between the years 1997 and 2004. The indictment set forth gener-

al information regarding the type of activity. It did not set forth the specific acts, *i.e.* Tackett raped Sarah in the kitchen. Because of the general nature of the indictment, any acts Sarah and Nicholas testified about—as long as they met the criteria for sexual abuse, rape, and sodomy—fell within the counts of the indictment. Therefore, that testimony was not about uncharged acts.

Only Sarah's testimony about a "light flash" she believed was a camera fell outside the terms of the indictment; therefore, that is the only evidence that is subject to review. In light of the brevity of the testimony and the fact that the Commonwealth found no photographs, this testimony cannot possibly have affected the outcome. Therefore, we discern no palpable error.

### (3) Testimony About Acts not Contained in the Jury Instructions.

 The trial court, in keeping with our opinions regarding the need to insure unanimous verdicts,[3] closely tailored the jury instructions to the specific acts that could be supported by testimony from Nicholas and Sarah. Tackett did not object to the jury instructions but now argues that Nicholas's and Sarah's testimony about acts that were not included in the instructions somehow violated KRE 404(b). This argument is without merit for four reasons.

First, we note that KRE 404(b) precludes evidence of prior bad acts. It does not preclude evidence of acts within the indictment that are, for whatever reason, not ultimately included in the jury instructions. As we stated above, Sarah's and Nicholas's testimony did not, except as noted, go beyond the bounds of the

charges in the indictment. Therefore, the acts they described were not prior acts. Second, as noted by the Commonwealth, jury instructions are tailored to the evidence, the evidence is not tailored to the instructions. *See Wright v. Commonwealth,* 391 S.W.3d 743, 746 (Ky.2012), as modified on denial of reh'g (Feb. 21, 2013). Taking Tackett's argument to its logical conclusion, the court and the parties would have to predict accurately before trial exactly what the evidence would show; craft jury instructions accordingly; and only present evidence that exactly conforms to their predictions. That is not how the system works, nor could it work that way, given the unpredictability of witness testimony. Finally, as noted above, the trial court instructed the jury in accord with our recent decisions regarding unanimous verdicts. The instructions included specific references to specific acts and omitted any acts about which the evidence was not clear. That is exactly what we have instructed the courts to do.

For the foregoing reasons, we hold that the court's "failure" to instruct the jury regarding every one of Tackett's alleged acts did not convert evidence regarding those acts into impermissible KRE 404(b) prior bad acts evidence. Furthermore, we hold that the court was not required to instruct the jury regarding each act Sarah and Nicholas testified to in order to prevent that conversion from taking place.

### (C) Other Alleged Bolstering

Tackett argues he was unduly prejudiced by the Commonwealth's opening statements in the guilt phase and the bolstering of the victims' testimony by: (1) Sarah's and Nicholas's testimony; (2) Sa-

---

**3.** *See Kingrey v. Commonwealth,* 396 S.W.3d 824 (Ky.2013); *Johnson v. Commonwealth,* 405 S.W.3d 439, 461 (Ky.2013).

rah's and Nicholas's respective mothers' testimony; (3) the testimony of forensic interviewer Jennifer Kelly; (4) the testimony of Detective Carter; and (5) the testimony of Detective Frasier. The Commonwealth argues these, and all the other issues before us, are improperly brought on direct appeal and should instead be brought under an RCr 11.42 motion for ineffective assistance of counsel. Each of these arguments is also unpreserved and therefore reviewed under the palpable error standard pursuant to RCr 10.26.

### (1) The Commonwealth's Opening Statement.

 Tackett argues the Commonwealth's assertion in opening statement that the victims' were telling the truth is reversible error. In its opening statement to the jury, the Commonwealth stated:

> The only proof in this case comes from the stand ... This case is all about the truth, all about credibility. If the witnesses are not credible, we do not have a case ... what we're looking at is the testimony of two young people who waited a considerable length of time to report these allegations ... I believe strongly in my heart that these kids are telling the truth. They have nothing to gain by not telling the truth. This is not one of those situations where they are in the middle of a divorce. Where there is something that has happened that is forcing them to do something. This is legitimate, folks. I think that after you have heard the evidence and see these kids testify ... I think when you've heard the evidence I think you'll understand why I'm asking for the penalties I'm asking for. For you all to convict Mr. Tackett for exactly what he was

charged for: rape, sodomy and sexual abuse. Thank you.

The only Kentucky case cited by Tackett does not support his argument. In *Armstrong v. Commonwealth*, 517 S.W.2d 233, 236 (Ky.1974), the Commonwealth stated in its closing argument to the jury that the Commonwealth had known and worked with a police officer who testified; that the Commonwealth knew him to be honest and conscientious; and that his word was worthy of belief. Our predecessor Court held this to be an improper means of attesting to a witness's credibility; however, the Court also found the statement had little to no prejudicial effect on the defendant. *Id.* Furthermore, opening and closing statements are not evidence, and the prosecutor is afforded considerable latitude in making such statements. *Stopher v. Commonwealth*, 57 S.W.3d 787, 805–06 (Ky. 2001). We agree with our predecessor Court that, although improper, the Commonwealth's statements had little prejudicial effect on the defendant. Thus reversal is unwarranted.

### (2) Bolstering Testimony by Sarah and Nicholas

 Tackett argues that Sarah and Nicholas improperly bolstered their own testimony. We disagree.[4]

During direct examination, Sarah testified that she was involved in Beta Club at school and that Beta Club is for students who are involved in community service and who have good grades and character. Tackett argues that this testimony impermissibly bolstered Sarah's other testimony.

 A witness is not permitted to bolster her own testimony unless and until her credibility has been attacked.

---

4. We note that Tackett also argues in this section of his brief that Sarah and Nicholas gave impermissible victim impact testimony during the penalty phase of the trial. We address that argument separately.

*Brown v. Commonwealth,* 313 S.W.3d 577, 628 (Ky.2010). However, testimony regarding a witness's background is admissible. *Ernst v. Commonwealth,* 160 S.W.3d 744, 763 (Ky.2005). Sarah's testimony regarding her participation in Beta Club is admissible background evidence. Furthermore, Tackett's counsel put Sarah's credibility at issue in his opening statement when he asserted that Sarah refused to state that she knew the difference between the truth and a lie during the Hope's Place interview. He also put Sarah's credibility at issue, as well as Nicholas's, when he asserted that there was no corroborating evidence to confirm their versions of events. Therefore, to the extent Sarah's testimony about her participation in Beta Club amounted to bolstering, it was permissible because Tackett had put her credibility at issue.

■ As to Nicholas, the Commonwealth asked him if he was telling the truth, if he had made up the allegations, if he had any reason to lie, and if his testimony was accurate. Tackett argues that Nicholas's testimony that he was accurately telling the truth and had no reason to lie, amounted to impermissible bolstering. As noted above, a witness is not permitted to bolster his own testimony until his credibility has been attacked. *Brown,* 313 S.W.3d at 628. However, as also noted above, Tackett's counsel, in his opening statement, attacked the credibility of both Nicholas and Sarah, and Nicholas's testimony was in response to that attack. Furthermore, Nicholas had already sworn to tell the truth and, as we noted in *Brown,* his testimony that he was doing so posed "little risk of short-circuiting the jury's credibility determination." 313 S.W.3d at 628.

Therefore, we determine that admission of the complained of "bolstering" testimony by Sarah and Nicholas was not palpable error.

### (3) Victim Impact Testimony by Sarah and Nicholas

■ Tackett argues that both Sarah and Nicholas gave victim impact testimony during the guilt phase of the trial. He specifically points to Sarah's testimony that she has an extremely sensitive gag reflex, making medical examinations, brushing her teeth, and sometimes even eating, difficult; that the examination at Hope's Place was unpleasant and embarrassing; and that she had been seeing a psychiatrist during the preceding year. Tackett also points to Nicholas's testimony that the examination at Hope's Place was unpleasant.

■ As we have held in the past, "introduction of victim impact evidence during the guilt phase is reversible error." *Ernst v. Commonwealth,* 160 S.W.3d 744, 763 (Ky.2005). However, introduction of victim background evidence, which is not aimed primarily at appealing to the jurors' sympathies but at providing an understanding of the nature of the crime, is not. *Id.* at 763–64. Furthermore, because Tackett did not preserve this alleged error, he must establish that admitting the evidence caused a manifest injustice or that, absent this evidence, the result would probably have been different. *Martin* 207 S.W.3d at 3.

Initially, we note that the complained of testimony from Sarah came during re-direct examination after Tackett had directly attacked Sarah's credibility and questioned whether the events she described had even occurred. Therefore, Sarah's testimony was relevant to show that she was not fabricating the allegations. Consequently, while Sarah's testimony may contain elements of victim impact testimony, it also contained elements of rebuttal testimony.

As to Nicholas's testimony, it came out on direct, not re-direct. However, as pointed out above, Tackett had made Nicholas's credibility an issue. As with Sarah's testimony, Nicholas's testimony about the nature of the Hope's Place examination contained elements of both victim impact and credibility evidence and was admissible for that later purpose. Finally, Tackett has not shown how, absent this evidence, the result would have been different. Therefore, we discern no palpable error.

#### (4) Bolstering by the Victims' Mothers.

Tackett argues that testimony by Sarah's mother, Alice, and Nicholas's mother, Lou Ann, amounted to impermissible prior consistent statement testimony that bolstered Sarah's and Nicholas's testimony. We address each separately.

#### a. Alice's Testimony.

██ Tackett points to the following specific testimony from Alice as constituting improper bolstering of Sarah's testimony. Alice testified that: (1) Sarah first told her that she had been abused by Tackett in May or June 2010; (2) she wanted Sarah to go to therapy, but Sarah initially refused; (3) a police officer contacted her after Sarah first went to therapy in May 2011; (4) Sarah was then referred to Hope's Place, where Sarah was interviewed; (5) she was not permitted to be with Sarah during the Hope's Place interview; and (6) she did not suspect any foul play at the time but in hindsight:

I kind of look back now and see different little things that she ... can I say that she would get rashes on her—and I called my mother—down on her vagina and it would be red and irritated. My mom said put cream on it and she had allergies. And she said—she couldn't use bubble bath anymore. Like when we would—we just recently went to the doctor. Still to this day, they just tried

to do a throat culture because they think. . . .

At that point, Tackett's counsel objected and the following discussion took place at the bench:

Commonwealth: I'm trying to keep her under control. This gal wants to talk.

Tackett's Counsel: I think she's just nervous, to be honest with you. The objection—she's starting to get way outside the question and she's going on about things the doctor said and she's about to go into . . .

Commonwealth: It is hearsay, and I'll try to stay away from it.

Court: You asked her if she had any suspicions and she's going back, looking, and telling what her suspicions were so I can understand that she's veering off, but you better rein her back in. Okay?

Tackett's counsel did not object to any of the rest of Alice's testimony and did not ask the court to admonish the jury to disregard any of Alice's testimony. Because Tackett did not object to the majority of Alice's testimony about which he now complains or seek an admonition regarding the testimony to which he did object, we review his allegations of error under the palpable error standard.

██ Tackett is correct that:

It is improper to permit a witness to testify that another witness has made prior consistent statements, absent an express or implied charge against the declarant of recent fabrication or improper influence. KRE 801A(a)(2). Otherwise, the witness is simply vouching for the truthfulness of the declarant's statement, which we have held to be reversible error. *Bussey v. Commonwealth*, 797 S.W.2d 483, 484–85 (Ky. 1990). *See also LaMastus v. Commonwealth*, 878 S.W.2d 32, 34 (Ky.App.

1994). We perceive no conceptual distinction between testimony that repeats the witness's prior consistent statement verbatim and testimony that the witness previously made statements that were consistent with her trial testimony. Either way, the evidence is offered to prove that the declarant's trial testimony is truthful because it is consistent with her prior statements. "A witness cannot be corroborated by proof that on previous occasions he has made the same statements as those made in his testimony." *Smith v. Commonwealth,* 920 S.W.2d 514, 517 (Ky.1995).

*Dickerson v. Commonwealth,* 174 S.W.3d 451, 472 (Ky.2005). However, Tackett's argument fails with regard to Alice's testimony for three reasons.

First, to be a "prior consistent statement" violation, testimony must repeat a statement made by another witness prior to trial or at least indicate the witness made such a statement. Alice testified that: she wanted to take Sarah to therapy and eventually did so; she was contacted by a police officer; Sarah was referred to Hope's place; and she took Sarah to Hope's place, where she was excluded from the interview. This testimony did not repeat prior statements by Sarah or even refer to prior statements by Sarah. It was simply a recitation of what occurred. Therefore, that testimony by Alice cannot violate any prohibition against prior consistent statements.

Second, Tackett argues that Alice's testimony about Sarah's vaginal rashes is tantamount to the evidence that we determined was improper in *Blount v. Commonwealth,* 392 S.W.3d 393 (Ky.2013). We disagree.

In *Blount,* the defendant objected when the victim's mother testified that her daughter exhibited signs and symptoms of "child abuse accommodation syndrome."

*Id.* at 395. The trial court sustained the objection, in part, holding the mother could testify to changes in her daughter's behavior as long as she did not tie that testimony to information garnered from the daughter's counselor. *Id.* Blount moved for a mistrial, but before the court could rule on that motion, he withdrew it and requested and received an admonition. *Id.* 395–96. When the victim's father testified about his daughter's behavioral changes, Blount asked for a continuing objection but did not ask for any other relief. *Id.* at 398. This Court held that, while it was error for the court to permit the parents to testify as they did, Blount was not entitled to reversal of his conviction. *Id.* at 398. In doing so, we noted that, because Blount did not timely or adequately preserve the issue, we could not grant the mistrial on appeal that he did not seek at trial. *Id.*

Tackett's attempt to equate Alice's testimony to the parents' testimony in *Blount* is not persuasive. Unlike the parents in *Blount,* Alice did not attempt to tie Sarah's vaginal rashes and overactive gag reflex to anything she learned during counseling or to anything she learned from a counselor. Furthermore, as in *Blount,* Tackett did not ask the trial court for any type of relief, and, as with the defendant in *Blount,* Tackett has not shown why we should grant him relief he did not seek.

Third, on cross-examination, Tackett asked Alice if she was suspicious of Sarah's allegations, and Alice responded that she believed her daughter. Tackett cannot now complain about the statement by Sarah—Tackett sexually abused me—that Alice testified about on direct examination when he elicited similar, if not more prejudicial, testimony on cross-examination.

Finally, we note that Tackett argues that the Commonwealth's introduction of a photo collage of Sarah was used by the Commonwealth to elicit sympathy from the

jury and, presumably was irrelevant. When the Commonwealth introduced the collage, Tackett's counsel specifically stated that he had seen it and had no objection to its introduction. In light of that statement, Tackett cannot now argue that admission of the collage was palpable error.

### b. Lou Ann's Testimony.

█ Tackett argues that the following testimony by Lou Ann amounted to impermissible prior consistent testimony or bolstering: (1) she testified that she spoke with Nicholas about the allegations of sexual abuse and Nicholas agreed to talk to the police; (2) she testified that Alice told her about Sarah's allegations; (3) she testified that Nicholas made an appointment to go to Hope's Place to give a forensic interview; and (4) she testified that she took Nicholas to counseling.

First, we note that Tackett's counsel objected to Lou Ann's testimony during direct examination about · her discussion with Alice, an objection the court sustained. Despite the court's favorable ruling, Tackett asked Lou Ann about her conversation with Alice on cross-examination, and Lou Ann reiterated the objected-to testimony. Tackett cannot now credibly claim that this testimony amounted to any error, let alone palpable error.

Second, as noted above, to be a prior consistent statement violation, testimony must repeat or at least reference a statement made by another witness prior to trial. None of the other objected-to testimony is related to statements by Nicholas; therefore, there can be no prior consistent statement violation.

Tackett also argues that it was error for the court to permit introduction of a photo collage of Nicholas. However, as with the photo collage of Sarah, Tackett's counsel specifically stated that he had no objection, and he cannot now argue that the court's

admission of that evidence amounted to palpable error.

### (5) Testimony by Jennifer Kelly.

Tackett objects to the following testimony by Jennifer Kelly: (1) Kelly testified about her training and interview methods; (2) Kelly testified that her goal was to get to the truth; and (3) Kelly testified that Sarah's interview was "difficult" and Sarah was hesitant to speak. During Kelly's direct examination, Tackett's counsel and the attorney for the Commonwealth approached the bench when it appeared that Kelly might give hearsay testimony, and the court reminded Kelly to avoid saying what Sarah might have said. Tackett did not otherwise object to any of Kelly's testimony.

█ According to Tackett, Kelly's testimony amounted to impermissible child abuse accommodation syndrome evidence and impermissibly bolstered Sarah's and Nicholas's testimony.

It is well-settled that a witness cannot vouch for the truthfulness of another witness. In the context of child sex abuse cases, this Court has repeatedly held that no expert, including a medical doctor, can vouch for the truth of the victim's out-of-court statements. Indeed, this rule applies even when a witness *indirectly* vouches for the truth of the victim's statement. In *Bell [v. Commonwealth*, 245 S.W.3d 738 (Ky.2008) *overruled on other grounds by Harp v. Commonwealth*, 266 S.W.3d 813 (Ky. 2008) ], this Court stated that it was error to allow a social worker to testify that a child sounded "spontaneous" and "unrehearsed" in describing sexual abuse. Although the social worker in *Bell* did not literally say that she believed the child to be truthful, her opinion about the child's truthfulness was

implicit in her statements, and so her testimony was impermissible bolstering. *Hoff v. Commonwealth*, 394 S.W.3d 368, 376 (Ky.2011) (internal citations omitted).

■ As to Kelly's testimony about her training and interview methods, Tackett has not cited to any authority that such testimony was improper. Furthermore, he has not stated with any specificity how that testimony bolstered Nicholas's or Sarah's credibility or affected the outcome. Therefore, we hold that the admission of such testimony did not amount to palpable error.

■ As to Kelly's testimony about getting to the truth, we note that Tackett's counsel asked Kelly repeatedly on cross-examination about her goal of getting to the truth; about whether Sarah said she would tell the truth; about whether Kelly discussed with Sarah the difference between the truth and a lie; and about how Kelly attempts to get to the truth. It appears that Tackett pursued this line of questioning as part of his defense strategy to show that Sarah and Nicholas were fabricating their allegations. Tackett cannot now complain that this strategy did not succeed.

As to Kelly's testimony about Sarah's demeanor, we first note that Tackett questioned Kelly at length about Sarah's demeanor during the interview. Therefore, his complaint about the Commonwealth's questions is less than persuasive. Furthermore, unlike the witnesses in *Bell* and *Hoff*, Kelly's responses did not directly or indirectly vouch for Sarah's veracity. In fact, when questioned about how she tries to get to the truth, Kelly stated that her job was to get information, not to evaluate that information.

**(6) Testimony by Detective Carter.**

■ Tackett argues that the following testimony by Detective Carter impermissibly bolstered Nicholas's testimony: (1) Detective Carter testified about the investigative steps he took—watching Sarah's forensic interview, calling Nicholas's mother, setting up and watching the forensic interview of Nicholas at Hope's Place, obtaining an arrest warrant, and arresting Tackett; and (2) Detective Carter testified that "the family thought [Tackett] could have taken photos and things like that" so he seized Tackett's computer. Tackett did not object during Detective Carter's testimony,[5] thus, none of these issues is preserved, and we analyze them for palpable error. Having reviewed the record, we discern no palpable error with regard to Detective Carter's testimony for four reasons.

First, we note that Tackett indicated that he intended to introduce the video of Nicholas's forensic interview if the Commonwealth did not. Therefore, Tackett waived any objections related to the playing of that video. Furthermore, it is unclear how Detective Carter's testimony that he watched Nicholas's forensic interview, making no comments about the interview, in any way bolstered Nicholas's testimony.

Second, although Tackett argues that the remainder of Detective Carter's testimony outlined in number one above violated the "investigative hearsay" exception, Tackett has not delineated what specific parts of that testimony did so. Having reviewed those portions of Detective Carter's testimony, we discern little, if any, hearsay. Furthermore, because Detective

5. Tackett's counsel did ask for a bench conference to ensure that Detective Carter did not mention that Tackett asked to consult with an attorney and to take a lie detector test. However, he made no objections.

Carter was the Commonwealth's last witness, evidence about Sarah's and Nicholas's forensic interviews and Detective Carter's conversations with Nicholas and his mother had already been introduced without objection by Tackett. Therefore, any error related to that testimony is harmless, at worst, and it certainly is not palpable.

Third, Tackett's reliance on *Gordon v. Commonwealth*, 916 S.W.2d 176 (Ky.1995) is misplaced. In *Gordon*, the investigating police officer testified that, based on information from an unnamed informant, he conducted an investigation of Gordon, who he suspected sold narcotics from a specific address. *Id.* at 178. Because the investigation involved use of a confidential informant, that informant's credibility was the primary issue before the jury. *Id.* This Court held that the officer's testimony was inadmissible because it "branded appellant a drug dealer, violated his right to confront and cross-examine witnesses, denied his right to be tried only for the crime charged, and in general, bolstered the credibility of the police informant to the point where appellant's denial of criminal conduct would have appeared preposterous." *Id.* at 179.

Herein, Detective Carter testified that the information he received which motivated his investigation was from the forensic interview of Sarah and Nicholas, not from an unnamed informant. Nicholas and Sarah both testified and were subject to cross-examination, unlike the unnamed informant in *Gordon*. Furthermore, in *Gordon*, the statement that Gordon was selling narcotics implied that Gordon had committed other crimes for which he was not charged. The testimony Tackett complains of in number one above goes only to the crimes for which Tackett was charged, not to other potential uncharged crimes. Finally, while Detective Carter's testimony

may have implicitly bolstered Nicholas's testimony, *e.g.* Detective Carter would not have undertaken his investigation if he did not believe to some extent Nicholas's allegations, that is true of most police investigations. Taking what we perceive to be Tackett's argument to its logical conclusion, all testimony by police officers regarding their investigations would be impermissible bolstering. That would be an absurd result.

 As to the second area of Detective Carter's testimony—why he seized Tackett's computers—that is based on hearsay. However, as with Nicholas's forensic interview, Tackett's counsel made it clear that he wanted information regarding the search of Tackett's computer in evidence. Furthermore, Detective Frasier had previously testified at length about the analysis of Tackett's computer. Therefore, any error regarding Detective Carter's testimony about Tackett's computer was harmless and not palpable.

## (7) Testimony by Detective Frasier.

 During his opening statement, counsel for Tackett asserted that Tackett's computer equipment had been seized, analyzed by the Commonwealth, and no evidence had been found. At the end of the second day of trial, the Commonwealth stated it would call Detective Frasier to testify about his analysis of Tackett's computer equipment. The judge indicated it was her understanding the computers contained "nothing." The Commonwealth's attorney stated that Detective Frasier did find some protected files; however, he could not open them and could not tell what they contained. Furthermore, the Commonwealth's attorney stated that, if Tackett's counsel had not asserted during opening statement that Tackett's computer contained no evidence, he would not have felt the need to call Detective Frasier.

Counsel for Tackett did not make any objection to Detective Frasier testifying.

The following day, Detective Frasier testified that he conducts forensic analysis of computer equipment for the Kentucky State Police, and that he analyzed Tackett's computer equipment. Detective Frasier testified that he found and examined a significant amount of data but found nothing he considered illegal or related to criminal activity. However, Detective Frasier noted that he found some "bin" files, which he could not open, and that he could not tell what type of files they were or what they contained.

On cross-examination, Detective Frasier testified that a forensic analysis of a person's computer gives him a glimpse into that person's life. Detective Frasier testified that he found no evidence of pornography in Tackett's computer equipment; although he generally finds some evidence of adult pornography in all computers he analyzes. Detective Frasier testified that, when examining a suspected pedophile's computer, he will generally find photographic evidence as well as evidence of communication with others who have similar interests. However, he found no such evidence on Tackett's computer equipment.

On re-direct, Tackett made his only objection to Detective Frasier's testimony when the Commonwealth asked about the "average pedophile." At a bench conference to discuss this objection, the judge stated that she did not believe that Detective Frasier's testimony was in any way relevant. The Commonwealth's attorney agreed but reiterated that he felt the need to rebut the assertion by Tackett's counsel during opening statement that there was "nothing" on Tackett's computer equipment. Despite the judge's statement regarding relevance, Tackett's counsel did not object to Detective Frasier's testimony

or move to strike it. Ultimately, the Commonwealth withdrew the question and, shortly thereafter, Detective Frasier's testimony concluded.

Tackett now objects to Detective Frasier's testimony arguing that it was irrelevant, more prejudicial than probative, and that it should have been excluded. We agree that Detective Frasier's testimony was irrelevant, and exclusion of his testimony would not have been error. However, as with the majority of evidentiary errors Tackett now raises, he made no objection, even though the judge essentially invited him to do so. In fact, based on counsel's assertions during opening statement, it appears that Detective Frasier's testimony was part of counsel's strategy— to show that there was no evidence other than the testimony of Sarah and Nicholas that Tackett had abused them. Furthermore, Detective Frasier's statement that he found no pornography, not even any adult pornography, was in response to Tackett's questioning on cross-examination. Finally, Tackett has not established that, absent Detective Frasier's testimony—testimony he apparently wanted— there is any "possibility that the result would have been any different." *See Commonwealth v. McIntosh*, 646 S.W.2d 43, 45 (Ky.1983). Therefore, the admission of Detective Frasier's testimony was not palpable error.

### (D) Nicholas's Drawing.

During his direct examination, Nicholas testified that he was approximately 6 years old when he drew a picture that he described as containing representations of a naked man with a penis, a frowning naked girl with blood and semen coming out of her vagina, and a monster with fire coming out of its eye and an ejaculating penis. Nicholas could not remember many specifics about why he drew the picture; only

that he was in gym class and bored. The Commonwealth introduced this drawing into evidence. Tackett's counsel did not object to Nicholas's testimony or to the introduction of the drawing into evidence.

On cross-examination, Nicholas reiterated his testimony about what the drawing contained but stated that he believed he drew it as a cry for help. Upon further questioning, Nicholas asserted that the man in the drawing was supposed to be his father.

In addition to Nicholas's testimony about the drawing, the Commonwealth called Nicholas's former elementary school counselor, Regina Jackson. Prior to trial, counsel for Tackett had filed a motion in limine, noting that in her report Jackson had included statements expressing opinions and speculation. Tackett's counsel sought to exclude that type of testimony. The Commonwealth agreed that any such testimony by Jackson would be improper and that her testimony would be limited to what she personally saw and observed. Counsel for Tackett then stated that he would reserve any objections until trial when Jackson testified. Before Jackson testified, the judge held a bench conference to verify the extent of Jackson's testimony.

During direct examination, Jackson testified that Nicholas was withdrawn, sad, sometimes angry, and had a flat affect. On appeal, Tackett argues that this testimony amounted to impermissible child sex abuse accommodation syndrome evidence. We note that Tackett did not object to this portion of Jackson's testimony[6] at the time and, on cross-examination, elicited testimony from Jackson that she had training in recognizing signs of sexual abuse. Because Tackett did not object to the introduction of the drawing, to Nicholas's testimony about the drawing, or to Jackson's testimony about Nicholas's affect, those issues are not preserved, and we review them for palpable error.

■ As to the drawing, it appears that Tackett's argument is two-fold: that the drawing should have been excluded because Nicholas's testimony about it was inconsistent; and that it should have been excluded because it was not relevant. As to the inconsistency in Nicholas's testimony, Tackett argues that, on cross-examination, Nicholas "suddenly remembered that at the time he was drawing the picture he meant it to mean semen and blood when he drew what was coming out of the figures." However, Nicholas gave essentially the same testimony on direct examination; therefore, that testimony is not inconsistent. Tackett also argues that Nicholas stated on direct examination that he could not remember why he drew the picture but on cross-examination stated that it was a cry for help. Furthermore, Tackett argues that Nicholas testified that, although he intended the male figure to be his father, the figure was naked, which was inconsistent with Nicholas's testimony that his father always wore a tee shirt. While the preceding may be inconsistent testimony, Nicholas's testimony during cross-examination, which was the most problematic for Tackett, was elicited by Tackett's coun-

---

**6.** Tackett's counsel did object to Jackson's testimony that she kept the drawing because she was concerned about the Tackett family. During a bench conference regarding this objection, the Commonwealth stated that it would rephrase its question. In response to the rephrased question, Jackson stated that she kept the drawing out of concern for Nich- olas. Furthermore, Tackett's counsel objected when Jackson testified that she had only seen similar drawings in cases involving sexu- ·al abuse. The court granted that objection and admonished the jury to disregard it. On appeal, Tackett does not assert any errors with regard to the preceding testimony by Jackson.

sel. He cannot now complain that this testimony, which he essentially invited, amounted to palpable error. *See Estep v. Commonwealth*, 663 S.W.2d 213, 216 (Ky. 1983) ("One who asks questions which call for an answer has waived any objection to the answer if it is responsive.") Finally, on this portion of Nicholas's argument, we note that inconsistency is not a reason to exclude evidence and that Tackett's counsel argued inconsistent testimony by Nicholas was a reason the jury should discredit Nicholas's testimony.

■ As to relevancy, Tackett notes that Nicholas testified that the drawing did not show any specific sexual acts. In support of his argument Tackett cites to the unpublished opinion of this Court, *Popp v. Commonwealth*, 2006–SC–000311–MR, 2008 WL 1850594 (Ky. Apr. 24, 2008). In addition to the fact that *Popp* is not controlling, it is unpersuasive. In *Popp*, a drawing of a figure with a penis was introduced into evidence through the child's father, who testified that the child said she got the idea from watching television or a movie. This Court held that the drawing was irrelevant because it was unrelated to the allegations of sexual abuse. However, this Court stated that, on remand, the drawing could be admissible if it could be tied to the alleged crime. Here the drawing was introduced through Nicholas who testified that it was a "representation of what I saw. What I felt I guess." Therefore, the drawing was tied to the alleged crimes, and its admission was not error.

■ As to Jackson's testimony, Tackett argues it amounted to impermissible child sexual abuse accommodation syndrome and impermissible bolstering of Nicholas's testimony. We disagree.

Jackson testified about Nicholas's affect, she did not testify what that affect meant or what conclusions could or should be drawn from Nicholas's affect. Therefore, her testimony was not impermissible child sexual abuse accommodation syndrome evidence. *See Blount v. Commonwealth*, 392 S.W.3d 393 (Ky.2013). Furthermore, to the extent the jury could infer Jackson's testimony was tied to sexual abuse, Tackett planted that seed by eliciting testimony from Jackson that she had training in recognizing sexual abuse. As with the majority of his other arguments, Tackett cannot now complain that any error he created is palpable.

As to bolstering, Jackson did not repeat any statements made by Nicholas nor did she make any statements regarding Nicholas's veracity. She simply testified about what she observed and how she came to have the drawing. That is not impermissible bolstering.

Finally, we note that Tackett has not established how the introduction of the drawing, to which he did not object, and Jackson's testimony about Tackett's affect as a child, to which he did not object, altered the outcome. Therefore, we conclude that any error in the introduction of this evidence was not palpable.

**(E) Juror Dismissal.**

■ Tackett argues that the trial court should have dismissed one of the jurors. This issue is not preserved, and we review it for palpable error. During *voir dire*, Juror C advised the court that he was an acquaintance of a potential witness—Sarah's father. Juror C stated that this relationship would not interfere with his ability to fairly decide the case. Neither Tackett nor the Commonwealth moved to strike Juror C, either for cause or peremptorily, and he was ultimately chosen to serve.

At the end of the first day of trial, Juror C approached the judge and the following conversation took place.

Juror C: I don't know if I can do this.... This is probably a bad time now but pshew.

Judge: Well let me say this, let's wait and see, and if it becomes a bigger problem, then if we need to....

Juror C: I have three kids, I mean pshew.

Judge: I understand. I understand. Try to—try to, let's give it overnight and I'll advise them of the issue but it is a difficult time because if another juror gets sick or something then we would have to use you as an alternate then we'd have to declare a mistrial.

Juror C: I don't know what's going on pshew.... I don't know.

Judge: I understand. I understand. You kind of think overnight okay. Alright I'll see you back tomorrow.

Judge: Alright, counsel let me ... Counsel, let me advise you that Mr. C just spoke with me here, and he's already having concerns about his ability to serve in this case due to the fact of the subject matter. So I told him just to kind of hang tough there because it would create a problematic situation if we had to use him as an alternate and someone would get sick. So he said, you know, I guess once the details started rolling out, the fact that he's got children of his own, I think it's making him concerned. So, I just wanted to make you all aware of that. Okay?

Commonwealth: I thought we would have covered that.

Defense: I thought we did plenty on it.

Judge: Well, we did. We did, but I'm just making you aware of that. Okay? Is there anything else that you all want to put on the record?

Commonwealth: No.

Defense: (No response.)

As the jury was leaving at the end of the second day of trial, another juror approached the judge and advised her that his brother was critically ill and in the hospital. The judge asked the juror if he wanted to be excused to visit his brother. The juror stated he did not; that hospital personnel were discouraging visitors; and that he just wanted the judge to know in case something changed with his brother's condition.

After that juror left, the attorneys and judge had a preliminary discussion regarding jury instructions. Following that discussion, Tackett's counsel asked the judge if everything was "okay with the jurors." The judge said there were "no problems" and relayed what the juror had said about his brother's health problems. As to Juror C, the judge said, "He never said a word. Though he did kind of give me a 'please' look when he came in this morning. I think-I think he's okay. I think he's had to tough it out today. So, he's over the hump now...." Tackett's counsel said that he was concerned when he saw a second juror approaching the bench indicating he thought that juror might have a problem similar to Juror C's. The judge reiterated that the second juror was simply advising her about his brother's health problems. That ended the discussion. We note that the juror whose brother was ill was dismissed as the alternate because his brother had died. Therefore, Juror C took part in deliberations.

Tackett now argues that Juror C's presence on the jury violated his constitutional right to be tried before a fair and impartial jury. We disagree for four reasons.

First, we have previously held that failure to object to a juror's continued service once counsel is notified of a problem acts as a waiver of the objection. *Johnson v. Commonwealth,* 892 S.W.2d 558, 562 (Ky.

1994).[7] As with other issues raised by Tackett, counsel had the opportunity to object to Juror C's continued service, and was, for all practical purposes, invited to do so. Having chosen not to object before the trial court, which was in a much better position to judge Juror C's demeanor, Tackett cannot now claim palpable error.

Second, in support of his argument, Tackett states that "[t]he record reveals that this juror was equivocal about his ability to sit as a fair and impartial juror, he did not display an attitude of appropriate indifference." However, what the record reveals is that Juror C, after opening statements, believed that he might be disturbed by what Tackett's counsel and the Commonwealth said the evidence would be. Juror C did not state that he would be disposed to deciding the case one way or the other.

Third, the morning after Juror C came forward, Tackett did not ask the judge to check with Juror C to see if he had considered matters and would be able to sit through the trial. Finally, Tackett has not set forth anything, other than bare assertions of prejudice, indicating that the result would have been different if Juror C had not sat on the jury.

Based on the preceding, the trial court's failure to dismiss Juror C was not palpable error.

## (F) Speeedy Trial.

Tackett argues that he was denied his constitutional right to a speedy trial.

The right to a speedy trial is guaranteed by both the Sixth Amendment of the United States Constitution and Section 11 of the Kentucky Constitution. When a speedy trial violation is raised on appeal, a reviewing court must consider four factors to determine if a violation occurred: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Bratcher v. Commonwealth*, 151 S.W.3d 332 (Ky.2004). We must balance these factors by first considering each factor individually and then weighing them together. *Smith v. Commonwealth*, 361 S.W.3d 908 (Ky.2012).

*Goncalves v. Commonwealth*, 404 S.W.3d 180, 198 (Ky.2013) *cert. denied,* —— U.S. ——, 134 S.Ct. 705, 187 L.Ed.2d 567 (2013). We address each of the *Barker* factors below.

### (1) Length of Delay.

Tackett was arrested on June 18, 2011, which started the speedy trial clock running. *See Dunaway v. Commonwealth*, 60 S.W.3d 563, 569 (Ky.2001). His trial did not begin until a year and half later. We have held a thirteen-and-a-half month post-accusation delay to be presumptively prejudicial. *Id.* As in *Dunaway*, this case was not overly complex; therefore, the delay of nearly eighteen months was presumptively prejudicial. However, a finding of presumptive prejudice does not entitle a defendant to relief, it only entitles

---

7. We recognize *Johnson* is not directly on point. In *Johnson*, a juror advised the judge that he did not think he could continue to act as a juror "because of what he considered to be unjustifiable delays in the trial and the fact that the jury was sequestered." 892 S.W.2d at 562. Without objection by the parties, the court required the juror to continue serving until the end of the trial, when the juror was excused as an alternate. In this case, excusing Juror C as an alternate was not an available option. Nonetheless, we believe the holding regarding waiver has application herein in large part because of counsel's complete failure to raise any objection.

him to full analysis under the *Barker* standard.

### (2) Reasons for the Delay.

In order to assist us in our analysis of this factor, we set forth the procedural path this case took from indictment to trial.

On August 1, 2011, Tackett attended arraignment in circuit court without counsel. Tackett advised the court that counsel did not have notice of the arraignment, therefore, the court re-scheduled the arraignment for August 15, 2011. When the court advised Tackett that the arraignment would be re-scheduled, Tackett requested a speedy trial. The judge advised Tackett that she would note his request for the record, but advised him that he would need to reiterate that request when he returned for arraignment with counsel.

On August 15, 2011, Tackett again appeared for arraignment. His retained counsel could not be present; however, Tackett was represented by "stand-in" counsel. The judge advised Tackett that her office had informed his retained counsel of the request for a speedy trial and had advised counsel of several available trial dates. According to the judge, retained counsel indicated that any date in January or February 2012 was acceptable. Through stand-in counsel, Tackett waived formal arraignment and entered a plea of not guilty. The court then scheduled a pre-trial conference for October 17, 2011, and trial for January 18, 2012.

At the October 17, 2011, pre-trial conference, the court noted that Tackett was not present and asked if Tackett was waiving his right to attend. Counsel indicated that Tackett was waiving that right. Tackett's counsel then stated that he was waiting for additional discovery information regarding the contents of Tackett's computer from the Commonwealth. Furthermore, Tack-

ett's counsel indicated that he had received a substantial amount of information from the Commonwealth in discovery, was reviewing that information, and owed discovery to the Commonwealth. The court then set a second pre-trial conference for December 5, 2011.

At the December 5, 2011, pre-trial conference, the Commonwealth advised the court that the analysis of Tackett's computer had not been completed. Tackett's counsel reiterated that he wanted to go forward with the trial as scheduled, and the court noted that the timeframe for the parties to obtain and review the analysis of Tackett's computer was rapidly narrowing. Tackett's counsel stated that he understood the Commonwealth's predicament, and that he could not fault the Commonwealth. The court then scheduled a pre-trial conference for January 17, 2012.

On January 17, 2012, the judge stated on the record in open court that she had conducted a telephone conference with Tackett's counsel and the Commonwealth the preceding Friday. At that time, the Commonwealth advised the court that the computer analysis had not been completed, and it moved to continue the trial. The court stated that Tackett's counsel "objected for the record but also indicated that the motion was with cause and was not without foundation." The judge stated that the parties then discussed re-scheduling the trial to a date that would permit Tackett to retain his own computer expert, if necessary, once the Commonwealth had completed its analysis.

On March 5, 2012, the court conducted another pre-trial conference. The Commonwealth stated that, within a week the computer analysis would be completed, but that it had no preliminary report. The court asked the parties how they wanted to proceed, and Tackett's counsel asked for

a new trial date, which the court set for June 5, 2012. The court also indicated that if something in the schedule changed, the date could be moved forward.

On April 16, 2012, the court conducted another pre-trial conference. The Commonwealth stated that the computer analysis revealed no evidence that would be useful at trial. Tackett's counsel asked for the hard drive to review it, but the parties indicated that there would be no need for an expert. The parties then agreed that they would be ready to try the case on June 5, 2012.

On June 5, 2012, the judge indicated that she had been advised that the parties had reached a plea agreement. In exchange for a guilty plea to two counts of sexual abuse in the first degree the Commonwealth recommended a sentence of five years' imprisonment, probated for five years. Following the colloquy, Tackett entered a guilty plea.

On July 30, 2012, Tackett filed a motion to withdraw his guilty plea. Rather than conducting the scheduled sentencing hearing, the court conducted a hearing regarding the motion to withdraw plea. The Commonwealth had no objection to Tackett's motion, and after noting that Tackett was refusing to accept responsibility and that she likely would not have followed the plea agreement, the judge granted Tackett's motion. The judge then stated that the first available time she had open for a "first-case-status" trial would be in mid-December. The judge then offered a "second-case-status" trial date in early October. Tackett's attorney agreed to those dates.

On October 5, 2012, Tackett moved for a continuance, stating that his computer expert would not be available for trial in October. The court granted the motion, and set the trial for December 12, 2012.

Based on the preceding, the first delay in this case came in January 2012, when the Commonwealth requested additional time to have Tackett's computer analyzed. The Commonwealth had a legitimate purpose in having Tackett's computer analyzed and, as Tackett's counsel admitted, "the motion was with cause and was not without foundation." Although not without cause, this delay, which resulted in the trial being moved back six months, was necessitated by and weighs against the Commonwealth.

The second delay in this case came in June and July 2012 when Tackett entered and then withdrew his guilty plea. This delay, which amounted to approximately another six months, was necessitated by Tackett and weighs against him.

Setting aside for the moment issues related to prejudice to Tackett, the Commonwealth and Tackett caused the same amount of delay. Furthermore, Tackett has not shown that the Commonwealth acted in bad faith or otherwise intentionally caused the delay. In fact, Tackett admitted that he could not fault the Commonwealth for seeking any delay. Therefore, this factor does not weigh in favor of Tackett or the Commonwealth.

### (3) Assertion of Right.

Tackett timely asserted his right to a speedy trial at his arraignment. Furthermore, he reiterated his assertion of that right when the Commonwealth sought a continuance in January 2012. Thus, this factor weighs in his favor.

### (4) Prejudice.

Tackett contends that this factor weighs in his favor because he suffered "anxiety and concern" as a result of the delay. In support of this contention, he notes that he moved several times for a bond reduction, noting in one such motion that he was

sleeping on the jail cell floor due to overcrowding. The alleged problems with overcrowding in the jails are of concern; however, "[n]oticeably lacking from [Tackett's] brief is any concrete allegation of prejudice. Our precedent clearly holds that speculative and generic claims are insufficient to support a claim of prejudice." *Dickerson v. Commonwealth*, 278 S.W.3d 145, 151–52 (Ky.2009). Furthermore, we note that Tackett benefitted from the portion of the delay attributable to the Commonwealth, using the lack of evidence in his computer as a key portion of his defense.

Taking all of the *Barker* factors into consideration, and noting in particular Tackett's failure to articulate any concrete allegation of prejudice or bad faith on the part of the Commonwealth, we hold that his constitutional right to a speedy trial was not violated.

### (G) Cumulative Error.

Because we find that all of Tackett's unpreserved errors lack merit, he cannot prevail on a cumulative error argument. *See McQueen v. Commonwealth*, 721 S.W.2d 694, 701 (Ky.1986).

## III. CONCLUSION.

For the reasons stated herein, we affirm.

All sitting. ABRAMSON, CUNNINGHAM, KELLER and SCOTT, JJ. concur. VENTERS, J., concurs in result only. NOBLE, J. dissents by separate opinion in which MINTON, C.J. joins.

VENTERS, J., concurring in result only:

I concur in result only with the Majority opinion. I agree with Justice Noble's dissent that KRE 404(b) was violated by introduction of evidence of crimes other than the singular offenses charged, that the testimony about the victim's behavior violated, at least marginally, our long-standing prohibition against evidence based upon child's sexual abuse accommodation syndrome, and that defense counsel's opening statement did not open the door so as to justify the subsequent bolstering of the witness's testimony. Nevertheless, I do not join Justice Noble's dissent because none of the errors were preserved for appellate review and I cannot conclude that even the accumulation of those errors amounted to palpable error.

NOBLE, J., dissenting:

To think that a father would repeatedly sexually abuse and sodomize his own son, and commit the same acts on a female child visiting his daughter shocks the mind and invokes revulsion. Such acts cry out for accountability and harsh punishment. Yet even a person who stands *accused* of these acts is presumed to be innocent until proven guilty by proof beyond a reasonable doubt. He is entitled to a fair trial, and I do not believe the Appellant got one. Nor does the general lack of preservation of error in this case indicate that he got reasonably competent representation. Indeed, the trial court was unable to rule on admissibility of much of the erroneous evidence in this case because no objections were raised. And disgust for the nature of the charged offenses should play no part in deciding his guilt; respect for our vaunted jury system demands fair review, and if necessary, a reversal of an unfairly obtained verdict.

There are no eye witnesses in this case, except for the two children, Nicholas and Sarah,[8] whose testimony only includes one

8. These are not the children's names. Consistent with our practice, we use pseudonyms to

common incident, and there the recall of events is inconsistent. There is no physical evidence that can be tied to the sexual assaults because the trial occurred years after the alleged events. Neither of the children's mothers observed or heard anything suspicious at the time the events allegedly occurred. The two children remained friends for a number of years, and "dated" in the sixth grade. As the Commonwealth said in closing, either the jury believed the testimony of the two alleged victims or it did not. In fact, the jury did not believe all the alleged victim's claims because Appellant was acquitted of one count of sodomy against his son, Nicholas, and of one count of rape against the female child, Sarah.

The important question for this Court is whether the plethora of unpreserved errors in this case tipped the scales so much in favor of the alleged victims' testimony that the trial was manifestly unfair. There is no question that had the errors been preserved, they would be harmful.

First, the indictment in this case charged that the events in question as to each child, which are clearly delineated as to the offense, happened over a period of time rather than on a specific date. For Nicholas, the time period spanned 1997–2004. For Sarah, the time period spanned 2002–2004. The charges were appropriately addressed as single crimes in the indictment and the jury instructions were tied to specific testimony at trial, so there is no unanimity problem.

But one problem is that when the alleged victims testified, they also testified about other "bad acts" that were not the acts alleged in the indictment. The majority resolves this by saying these acts occurred within the time frame of the indictment so they were appropriate testimony. But the time frame of the indictment is not

protect their privacy.

controlling to permit evidence of any or all bad acts of a defendant at trial that may have occurred during that time frame. Rather, it is the nature of the evidence which must be considered, not whether the act could have been included in the indictment time period. Otherwise, the Commonwealth enjoys an end run around the strictures of KRE 404(b) by charging that a crime occurred during a period of time, introducing evidence of many instances of the crime during the time period that all seem to fit the indictment, and then "curing" any potential unanimity problem by limiting the jury instruction to a single instance.

Here, the Commonwealth did not give notice that it planned to introduce KRE 404(b) evidence of other bad acts, but it did elicit testimony from the alleged victims that were indeed other bad acts. And, in fact, some of this evidence did not fit within the indictment. And while some of it arguably did, that proof nevertheless violated KRE 404(b).

The Commonwealth's Attorney set the tone for the improper "piling on" evidence in opening statement. There, he claimed Appellant had threatened to harm the children's parents if the children told what he had done. But no testimony supported this, and the defendant was not charged with terroristic threatening.

Several of the instances were not covered by the indictment at all. For example, Sarah was permitted to testify Appellant took her and Nicholas to the basement, and made Nicholas rape and sodomize her. There was no charge against Appellant for this alleged behavior, such as use of a minor in a sexual performance, even though there could have been. This is also conduct that could *not* be covered by any of the

named charges in the indictment, because the alleged rape and sodomy were done by *Nicholas,* not the Appellant. Beyond doubt, this allegation is prejudicial because of its abhorrent nature, and it is further nothing more than propensity evidence that the Appellant was sexually deviant as to something, but not as to direct rape, sodomy or sexual abuse.

Next, Sarah testified that Appellant beat her with a belt a few times, but stated that she did not know why. Such conduct, while arguably assault or child abuse, is not rape, sodomy, or sexual abuse.

Finally, she testified in response to a question about whether Appellant had ever taken pictures during the abuse that once she thought she saw a flash, implying that Appellant was making child pornography, for which he also was not charged. But this was not for lack of trying or telling the jury about it. After the criminal complaint was filed, the police seized Appellant's hard drive and two external drives from his computer. The drives were examined by Detective Frazier of the Kentucky State Police Electronic Crime Branch. He found nothing on the drives related to child pornography, yet the Commonwealth called him as a witness and pursued a line of questioning about bin files, encryptions and file extensions, asking if things could be hidden on a computer. The detective replied that they could. But no inappropriate images of Sarah or anyone else were found on the drive.

Appellant had not been charged with child pornography or any other electronic crime, but this testimony strongly implied that Appellant was a child pornographer and that he had hidden the evidence of his crime. This was obviously irrelevant to the crimes being tried. It is equally obvious that this was extremely prejudicial to Appellant. To the trial court's credit, she questioned the relevancy, but as with most

of the problematic evidence in this case, she was not given an opportunity to exclude the evidence or give an admonishment because trial counsel did not object.

This questioning about a non-existent crime, coupled with the question to Sarah about whether she ever saw Appellant taking photos, and her response, clearly implied another bad act prohibited by KRE 404(b). But this was also otherwise inadmissible because it was simply irrelevant, having no probative value as to the crimes charged, and was extremely inflammatory.

As to Nicholas, he was permitted to testify that the sexual abuse from his father was "constant." While he may well have been the victim of multiple instances of abuse, his testimony that he was abused once a night or every other night "for quite a while" is testimony of more than the charged offense, which was framed around his testimony about the first instance when he claimed his father came into his bedroom and fondled his penis when he was five years old. That the action may have been repeated on other occasions does not go to prove that it happened in that one instant, and can only inflame the jury. While it is naturally information that sheds light on the child's plight, it has no probative value as to the single offense charged. Instead, it is evidence of other uncharged offenses used to show Appellant's propensity to commit the charged offense, and is therefore inadmissible under KRE 404(b).

Except for the implied child pornography evidence, it can be argued that each of these errors, standing alone, does not rise to the manifest injustice required to find palpable error. But cumulatively, they created strong prejudice in a trial that turned on the credibility of the witnesses, creating sympathy for them and revulsion toward Appellant, which tended to sway the jury to believe the alleged victims.

And I believe the interjection of implied child pornography, which is totally irrelevant, crosses the line standing alone and cumulatively with the forgoing in creating a manifestly unfair trial.

But there are even more unpreserved harmful errors.

Despite this Court having consistently held that expert witnesses could not testify that child sex abuse occurred based on the child's behavior—frequently termed "child sexual abuse accommodation syndrome"—to prove that an act of sex abuse occurred, *see, e.g., Hall v. Commonwealth*, 862 S.W.2d 321 (Ky.1993), prosecutors persist in interjecting that kind of evidence. At the heart of rejecting such evidence is the rationale that it "was not generally accepted in the medical community, and that the expert was unable to connect the victim's symptoms with the appellant rather than some other person." *Newkirk v. Commonwealth*, 937 S.W.2d 690, 691 (Ky.1996). While sexually abused children may indeed exhibit certain patterns of conduct, "children who had not been sexually abused might well exhibit similar traits," *id.*, and that conduct, standing alone, does not identify *who* the perpetrator is. Yet, when paired with an accusation by a child, such conduct seemingly supports the allegation but it does so without the level of reliability necessary for proof beyond a reasonable doubt. Instead, it invites rank speculation that the behaviors at issue are in fact related to sex abuse in a given child, or that the person the child names as the abuser is in fact the perpetrator. This becomes "circumstantial" evidence that cannot be tied in fact to a particular defendant being tried, unlike appropriate circumstantial evidence, which always has a nexus that is identifiable to a particular defendant, and not to just any possible defendant in the world. The evidence thus may be indicative that a particular offense,

such as rape or sodomy had happened to the child, or that the child had observed it, but not in any way be dispositive that the person accused did it.

In this case, Sarah's mother testified that she could "look back" and see conduct or situations that indicated abuse, such as a rash on the child's vagina "more than once," and that Sarah had a bad gag reflex, and "to this day, they just tried to do a throat culture." The last comment was particularly irrelevant but prejudicial, since the alleged event would have occurred years ago. And while this is not the pattern example of child sexual abuse accommodation syndrome testimony describing such conduct as evidence of a sexually abused child, there is a clear implication that this is what the events prove.

The forensic interviewer, Jennifer Kelly, who testified that she was trained at getting the truth out of child victims, also testified that Nicholas was very difficult and hesitant to speak, but that through her skilled interviewing, he did. Not only did this imply that hard to obtain testimony must be true, it also implied that he was behaving consistently with being sexually abused.

But the worst example of this type of evidence came when the Commonwealth introduced a drawing that showed a naked male and female figure, and what Nicholas described as "blood and semen" during Nicholas's testimony. Nicholas first testified that the drawing showed a man and a woman who were "doing things to each other." He remembered being in gym and bored when he drew the picture, but did not remember why he drew it. The drawing also showed what he called a "monster" with a giant mouth and eye with fire coming out of it, and an ejaculating penis. Nicholas first called the female figure a woman, then switched to girl, and finally agreed with the Commonwealth's sugges-

tion that it was a little girl. On cross-examination, he testified that he drew the picture as a cry for help. And after defense counsel pointed out that he had testified that Appellant always wore a shirt and the male figure was shirtless, Nicholas said the drawing was supposed to be his father.

The obvious problem with admitting this evidence is that it did not closely depict anything Nicholas had claimed occurred between him and Appellant. The figures were not identified on the drawing, and no sex act was actually depicted. Nonetheless, Nicholas's elementary school counselor, Regina Jackson, was allowed to testify that she had kept the drawing for years because of her concerns, and that she had only seen pictures like that "when they were sex abuse cases." Defense counsel did object at that point, and the court admonished the jury. But in closing argument, the Commonwealth disregarded the court's admonition, and asked how many children would draw pictures like that at age eight which showed a penis and a vagina, or a monster with an ejaculating penis, and then said, "A child who has seen this draws this kind of picture; a child who has experienced exactly what [Nicholas] says he experienced draws a picture like this. That's what that says." And while the Commonwealth may argue that sex abuse occurred, use of the picture allowed the Commonwealth to bootstrap the theory contained in the child sex abuse accommodation syndrome onto the argument that Nicholas was contemporaneously recording what had happened to him as a sexually abused child would, even though no sex act was depicted and there were no clear identifiers.

Finally, on another ground of error, Sarah was allowed to give significant victim-impact testimony in the guilt phase of the trial. The Commonwealth asked her, "How has this personally affected you?" She then replied that there were lots of things she could not do; that doctors had problems when they needed to stick anything into her mouth because she started gagging and crying; that she could hardly brush her teeth in the morning; that there were times she could not eat because she could not stand the feeling of anything going down her throat. She stated that she had been seeing a psychiatrist over a year. She testified that the evaluation at Hope's Place was not a pleasant experience because she had to take her clothes off and get in an embarrassing position. While such statements are relevant to fixing punishment in the penalty phase, they are not relevant to establishing the Appellant's guilt, and they naturally invoke sympathy for the victim that is highly prejudicial, in violation of KRE 403. Likewise, the mother's hindsight testimony about how their children acted at the time the abuse was alleged to have occurred also is improper victim-impact testimony in the guilt phase of the trial.

The effect, singly or cumulatively, of so many prejudicial errors is to render this a fundamentally unfair trial which does result in palpable error. Because these errors were not objected to, one approach would be to affirm the conviction, and leave fairness to be determined through a collateral attack. But given the level of error here, that would be unduly burdensome on the Appellant and on the court system. These errors are such that they cannot be explained as reasonable trial strategy, and passing this problem to a collateral motion is simply kicking the can further down the road. And the important fact is that the Appellant did not get even a "reasonably fair" trial. When that is so apparent, this Court should reverse, and implement the remedy for such failure as quickly as possible. Consequently, I would reverse and remand for a new trial

where the improper evidence was not allowed.

MINTON, C.J., joins.