RENDERED: JUNE 15, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0071-MR

ERIC ALDERSON                                                                      APPELLANT

|       | ON APPEAL FROM BALLARD CIRCUIT COURT |
| :---- | :----------------------------------- |
| V.    | HONORABLE TIMOTHY A. LANGFORD, JUDGE  |
|       | NO. 21-CR-00004                      |

COMMONWEALTH OF KENTUCKY                                            APPELLEE

**OPINION OF THE COURT BY JUSTICE THOMPSON**

**REVERSING AND REMANDING**

After a jury trial, Eric Alderson was convicted by the Ballard Circuit Court of two counts of first-degree rape and two counts of first-degree sexual abuse. He received a total sentence of thirty years. Alderson appeals his conviction as a matter of right, asserting trial errors and a sentencing error. We reverse his conviction and sentence and remand for a new trial because the trial court erred in permitting the Commonwealth to present victim impact testimony during the guilt phase of the trial and this error affected Alderson's substantial rights. We additionally address the other issues raised which could require further relief and to provide guidance to the extent these issues are likely to recur on retrial.

# I. FACTUAL BACKGROUND

Alderson, nineteen, lived at home with his mother, stepfather, younger sister (A.A.), and younger brother. A.A. was in high school and often had one of her friends come over to her house and spend the night. Alderson spent time "hanging out" in A.A.'s upstairs bedroom with A.A. and her guests. Alderson was alleged to have raped or sexually abused three of his younger sister's friends, A.R., R.D, and K.M. (the girls), at four separate sleepovers, after the girls had fallen asleep. At the time of each occurrence, only one of the girls was having a sleepover with A.A. and each of the girls was either fourteen or fifteen years old.

### A. K.M.'s Testimony Regarding the Initial First-Degree Sexual Abuse Charge (Count III)

According to testimony by K.M., on October 5, 2020, she spent the night with A.A. and woke up feeling something cold down her shirt and found that Alderson had his hands down her pants and shirt. He was touching her breast, nipple and rubbing her vagina.

### B. A.R.'s Testimony Regarding the First-Degree Rape Charge (Count I)

A.R. testified that on October 16, 2020, Alderson hung out with her and A.A. in A.A.'s bedroom and watched a movie with them. They fell asleep on the bed with Alderson still in the room. A.R. testified she woke up when she felt Alderson's hand in her pants; he was sitting beside her and had his finger inside her vagina. He stopped when she woke up.

2

A.R. testified she tied her sweatpants "really tight," went back to sleep and woke up again at 4 a.m. to find Alderson doing the same thing, having his finger inside her vagina. A.R. then moved around to get him to stop.

### C. K.M.'s Testimony Regarding the Subsequent First-Degree Sexual Abuse Charge (Count IV)

K.M. testified to a second incident when she spent the night with A.A. again on December 28, 2020. K.M. explained that Alderson made her uncomfortable by sitting too close to her. Fearing that Alderson would sleep in A.A.'s room, K.M. put on her sweatshirt and sweatpants over her shirt and shorts, tied them tightly, and lay down on the floor of A.A.'s room covered by two blankets. K.M. testified she stayed awake as long as she could but awoke to feeling a crawling sensation in her vaginal area and saw Alderson sitting in front of her with his hand in her blankets, with one hand on her vagina and another hand holding the blanket up. He moved his hand away, told her she looked cold, and got her another blanket.

K.M. testified she fell back asleep, awoke again to the same feeling, and found that Alderson had his hands outside of her pants and was rubbing her vagina. She moved, he removed his hand and then put it back again but stopped after she sat up and pretended to have a phone call.

### D. R.D.'s Testimony Regarding the First-Degree Rape Charge (Count II)

R.D. testified she spent the night with A.A. on January 1, 2021, and Alderson made her uncomfortable by trying to touch her leg and asking her to sit by him. Then when A.A. was showering and R.D. went downstairs, Alderson

3

went downstairs too, put his hand on her leg again and then made a hand gesture that R.D. interpreted as meaning "suck his dick." When R.D. returned to A.A.'s room, Alderson kept trying to get her to try to sit by him and A.A. while they watched a show.

R.D. testified that after Alderson and A.A. fell asleep in A.A.'s room, R.D. went downstairs to the living room and sat on a couch, with A.A.'s little brother on the other couch. She fell asleep there and woke up to Alderson pulling her pants down. R.D. testified she started crying, saying "No. Stop." Alderson stuck his fingers in her vagina and ignored her requests to stop and R.D. finally pushed herself away. According to R.D., Alderson then stared at her, got up and then told her she knew where to find him if she changed her mind.

R.D. told A.A. later that day what had happened.

### E.      Report of the Incidents

On February 23, 2021, R.D. reported what Alderson had done to her high school counselor. The next day, K.M. and A.R. made a report to the same counselor. The girls were all interviewed by a detective and then at Lotus, a child advocacy center, by a child forensic interviewer. The Lotus interviews were recorded. K.M. and R.D. received ongoing counseling at Lotus after they made their reports.

### F.      Alderson's Testimony

Alderson testified in his own defense and stated he was close to his sister A.A. and hung out with A.A. and her friends.

4

Alderson did not recall any incident involving A.R., but acknowledged she was frequently at his house. He denied all of her allegations.

Alderson recalled an incident with K.M. but did not recall when it occurred. He stated he had misplaced his e-cigarette after waking up in A.A.'s bed, felt around K.M.'s blankets for it and that woke her up. He denied patting anything but the top of the blankets or touching K.M. in an intimate matter but recalled bringing her a blanket because he noticed she was cold.

Alderson testified he recalled hanging out with A.A. and R.D. and watching a movie, R.D. was acting odd, he followed her downstairs and asked what was wrong, motioning at her to try to get her attention but she would not look at him. He went to bed in his room.

The next morning, he woke up and went to the kitchen to get something to eat. The kitchen is across from the living room. He saw R.D. asleep on the ottoman, his brother asleep on a couch, and tapped R.D. on the shoulder to ask her if everything was okay and she "freaked out," swatted at him, did not say anything and acted "frightened beyond belief." Alderson told her that he was here for her if she needed anything and told her he was not into raping a kid.

Alderson stated he went back to bed but before going to work he went to A.A.'s room and R.D. was there. A.A. pushed Alderson out of the room, told him that she hated him and that she never wanted to see him again.

Alderson testified that after further reflection on that night, he realized he was acting in a playful and flirty manner and must have made R.D. feel uncomfortable but he denied touching her inappropriately.

## II. PROCEDURAL BACKGROUND

On April 27, 2021, Alderson was indicted on four counts for his conduct on four separate occasions regarding the girls. Two counts were for first-degree rape of a minor "incapable of consent/physically helpless" based on Alderson's digital penetration two of the girls' vaginas[1]: A.R. (count one) and R.D. (count two). Two counts were for first-degree sexual abuse of K.M. (counts three and four) for the two incidents of touching her genitals.

Prior to trial, Alderson's motion for separate trials was denied on the basis that the circumstances involving each girl were similar enough that this evidence would also be admissible if the trials were separated.

During the Commonwealth's case in chief, the Commonwealth Attorney asked each of the girls how their rape or assault had affected their lives. Alderson objected to this question regarding K.M., but his objection was overruled. He did not make any objection to this question being asked of the other girls.

---

[1] In Kentucky, first-degree rape includes "sexual intercourse with another person" either by "forcible compulsion" or "who is incapable of consent because" that person "[i]s physically helpless[.]" Kentucky Revised Statutes (KRS) 510.040(1). "Sexual intercourse" is defined as including "penetration [however slight] of the sex organs of one person by any body part or a foreign object manipulated by another person." KRS 510.010(8).

After the Commonwealth completed its case in chief, Alderson moved for a directed verdict on the rape charge regarding R.D. as she was not physically helpless as stated in the indictment because she was awake before penetration. The trial court granted this motion and then, over Alderson's objection, allowed the Commonwealth to amend this count to rape by forcible penetration.

Alderson wished to impeach two of the girls' trial testimony regarding inconsistencies with their prior statements but declined to do so after the trial court signaled its willingness to let the girls' whole recorded interviews and written statements come in if he were to do so. Rather than risk this outcome, Alderson put on this testimony by avowal.

The jury convicted Alderson as charged on the two counts of first-degree rape and two counts of first-degree sexual abuse. The jury recommended Alderson serve ten years on each of the rape convictions and five years on each of the sexual abuse convictions, with these sentences be served consecutively for a total of thirty years of incarceration. On January 21, 2022, the trial court sentenced Alderson in accordance with the jury's recommendation, waiving court costs but imposing jail fees.

### III. ANALYSIS

**A. Admission of testimony about how the alleged sexual assaults affected the girls in the merits phase constituted impermissible victim impact testimony which deprived Alderson of a fair trial.—Partially preserved**

During the direct examination of K.M. (who was the first of the girls to testify), the Commonwealth Attorney asked K.M. "to tell the jury how all of this happening has affected you, how it's changed your life." Alderson objected to

7

this question on relevancy grounds and during the subsequent bench conference explained it sounded like the Commonwealth Attorney was soliciting victim impact evidence that was not appropriate at this stage of the proceedings. The Commonwealth Attorney responded that K.M.'s answer would go to credibility because victims who are traumatized "will have symptoms of trauma that the jury should be aware of to use in the analysis of their credibility." The trial court ruled "I'll give you some limited latitude, don't dwell on this, but it could go to credibility."

The following direct examination then occurred:

CW: Alright so, let's kind of start at the beginning. I just want you to tell me and the jury how this has affected you, how it's changed your life going forward, and what has happened to you because of this. You can take as long as you want.

KM: I have to go to therapy once a week, every week at a clinic in Paducah for abuse. I often have to take medicine to sleep at night, and even if I do end up getting sleep, I have, I have recent night terrors most nights. It's hard for me to be around family members that are male because I fear being close to them now. I often have flashbacks to the night in school and I'll have to go to the counselor's office to recuperate, I guess. Um, a lot of my friends at school found out and most people walk on eggshells around me which sucks because, uh, it took away my high school experience, my first year of high school. I can't see my best friend anymore because her house is my crime scene. And I'm scared all the time. It's hard to . . .

DA: Judge, may we approach?

At the bench conference, Alderson argued K.M.'s answer had gone far beyond what the trial court had allowed and constituted pure victim impact testimony as K.M. was talking about how other people treat her. The trial court said it was sustaining the objection going forward. The trial court then clarified

8

that K.M. was allowed to answer how it affected her, but she could not go any further.

During the direct testimony of A.R., the following exchange took place:

CW: So, I just kind of want you to tell me and the jury, how did this happening affect you going forward?

AR: It made me very depressed, and I couldn't trust. I still can't really trust anyone that well, and [it] makes me very uncomfortable in some situations I'm in, and I couldn't hang out with my best friend for a long time because she came over to my house once, but like it just kind of reminded me of the whole situation and when I went over there on February 13th, it just like brought me back a lot so, and my grades really got bad. I got on medicine and I couldn't sleep for a really long time, just scared.

Alderson did not object to this question.

During the direct testimony of R.D., the following exchange took place:

CW: Just for the jury and myself, can you please tell us how this happening has affected you and how it's changed your life going forward.

RD: It's made me really uncomfortable around a lot of people. I've been really scared of a lot of people since then.

These statements were then used by the Commonwealth in its guilt phase closing argument as follows:

What happens when all three people harmed that were harmed by the defendant Eric Alderson, K.M., R.D., and A.R., what happens when all three of them get up on the stand and relate to you the worst things that have ever happened to them, and how they have been affected, how they have developed mental issues because of it, how they've been harmed, how their status in the community has been affected, how they have suffered because of what happened.

These statements were also referenced by the Commonwealth in its penalty phase closing argument:

9

> During the proof phase I had each victim testify to you about how what had been done to them affected them. At that time the testimony was about credibility, to prove that their trauma was real and therefore the traumatic event was real. And I want you to think back on that.

Initially, we must consider whether this issue was preserved as to each girl's testimony. Alderson argues his objection to the question during K.M.'s testimony should sufficiently preserve it for both her testimony and the identical questions asked of the other girls later, but requests palpable error review if he is incorrect. The Commonwealth disagrees, arguing that Alderson waived any objection to the question being asked of the other girls as he failed to either request a continuing objection or to object to these questions when they were made. Alderson argues in his reply brief that his objection and the trial court's ruling on his objection, "should apply to the exact same question as to the two other alleged victims" as "[t]he initial objection put the court on notice that the defense believed the evidence should have been excluded."

We recognize that the trial court's ruling, that it was sustaining the objection going forward, is subject to two interpretations: it was sustaining the objection as to K.M.'s further testimony or it was sustaining the objection as to any of the girls being asked such a question. However, we do not believe this question needs to be resolved, or the question of preservation addressed further, because we are confident that allowing the victim impact testimony from K.M. was harmful to Alderson and deprived him of a fair trial, and that the addition of the other girls' victim impact testimony was sufficient to constitute palpable error.

10

Alderson argues that the questions asked of the girls were designed to elicit "victim impact" evidence, which is limited to the sentencing phase of the trial pursuant to KRS 532.055(2)(a)7 which provides for truth-in-sentencing. KRS 532.055(2)(a)7 specifies that during the sentencing phase of the trial, the Commonwealth is allowed to offer evidence regarding "[t]he impact of the crime upon the victim or victims, as defined in KRS 421.500, including a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim or victims[.]" Alderson argues permitting such evidence during the guilt phase of his trial is a reversable error. He also argues that such evidence was not admissible for credibility purposes as Child Sex Abuse Accommodation Syndrome (CSAAS) has no scientific support and cannot be used to identify children that have been abused, their behavior after the alleged abuse cannot establish that their trauma was real and, therefore, the traumatic event was real (as the Commonwealth Attorney stated was done during the proof phase). He additionally argues allowing such testimony impermissibly allowed the girls to vouch for their own credibility and each other's credibility.

The Commonwealth counters that once the girls' credibility was attacked, it was appropriate to ask each victim just one question to support their credibility and that questions regarding therapy are not improper. The Commonwealth argues Alderson had already questioned the girls' credibility in his opening statement regarding it being a "he said, she said" case. The Commonwealth explains that "Alderson's defense focused exclusively on the

11

credibility and recollection of the juvenile victims" with him questioning K.M. as to why she would return to the house after being sexually assaulted and attempting to impeach A.R. and R.D. "with alleged prior inconsistent statements in which they allegedly named someone else as the perpetrator of the sexual assaults." The Commonwealth further claims that even if there were error as to K.M.'s testimony, it was harmless and would not have changed the outcome of the trial given the strong case against Alderson formed by the consistent testimony of the girls which was only countered by Alderson's self-serving testimony.

We have before us for consideration the intersection of three different rules: (1) victim-impact evidence is typically inadmissible until the penalty phase of the trial; (2) victim background evidence is generally admissible; and (3) a witness can generally bolster her own testimony after her credibility has been attacked. *See Roe v. Commonwealth*, 493 S.W.3d 814, 823 (Ky. 2015) ("The prohibition of victim-impact evidence during the criminal responsibility phase of trial is deeply rooted in both our precedent and Kentucky statutory law."); *Bennett v. Commonwealth*, 978 S.W.2d 322, 325-26 (Ky. 1998) (explaining that victim background information is generally admissible); *Tackett v. Commonwealth*, 445 S.W.3d 20, 32 (Ky. 2014) ("A witness is not permitted to bolster her own testimony unless and until her credibility has been attacked.").

As explained in *Tackett*, victim impact evidence masquerading as victim background evidence is not permissible as the "introduction of victim impact evidence during the guilt phase is reversible error." *Id.* at 33 (quoting *Ernst v.*

12

*Commonwealth,* 160 S.W.3d 744, 763 (Ky. 2005), *overruled on other grounds by Mason v. Commonwealth*, 559 S.W.3d 337, 341-42 (Ky. 2018)). One way to determine the difference between victim impact evidence and victim background evidence is whether the evidence is "aimed primarily at appealing to the jurors' sympathies" or "providing an understanding of the nature of the crime[.]" *Tackett*, 445 S.W.3d at 33. *See Ernst*, 160 S.W.3d at 763–64 (comparing collecting cases of appropriate victim background evidence contrasted with cases in which improper victim impact testimony was made).

"[H]ighly inflammatory" evidence with "little or no probative value" which concerns the "terrible loss" suffered based on the crime is not appropriate for introduction during the guilt phase of a trial. *Ice v. Commonwealth*, 667 S.W.2d 675-76 (Ky. 1984). Arousing the jurors' sympathy "although relevant to the issue of penalty, is largely irrelevant to the issue of guilt or innocence." *Bennett*, 978 S.W.2d at 325.

K.M.'s answer provided a great deal of information about how her life had changed for the worse after the crime was committed and had a long-term impact on her life. When it is evaluated for whether it constituted victim impact testimony or victim background information, by its very nature it constitutes victim impact testimony because it established the terrible consequences of the defendant's actions on her life going forward and was likely to arouse the jurors' sympathy.

The next consideration is whether this question was nevertheless appropriate to bolster K.M.'s credibility because, as the Commonwealth argued,

13

Alderson attacked her credibility during his opening statement on the basis that this case was a "she said, he said" type of case.

The Commonwealth heavily relies on *Tackett*, but Tackett's appeal was on a different procedural posture than Alderson's because Tackett did not preserve the claimed error through objection or put on any evidence in his defense. *Tackett*, 445 S.W.3d at 26. Under those circumstances, it would have been very difficult for any defendant to establish manifest injustice or a different result at trial in the absence of this evidence.

Having reviewed Alderson's opening statement, we disagree with the Commonwealth's premise and conclusion. The defense stressed the importance of keeping an open mind throughout the trial, analogizing the progression of the trial to seeing everyone adding to a painting, with the jury not knowing what the painting would look like until the end. The defense explained the evidence presented would be exclusively testimonial and then stated: "At the end of the case what you're gonna find is it is essentially a 'he said, she said' situation and you won't know the entire story until you've heard from every single witness here today, and at that point you'll have to make up your mind about this case."

Alderson did not make any particular attack on the girls' credibility in this opening statement, certainly nothing to justify the Commonwealth Attorney asking this question and soliciting very inflammatory information before Alderson had even cross-examined the girls about any inconsistencies in their testimony. The defense's opening statement innocuously informed the

jurors about what sort of evidence to expect and cautioned them to reserve judgment until the end of proof.

Such an opening statement cannot properly be interpreted as attacking the girls' credibility; therefore, it cannot justify the Commonwealth Attorney asking such questions to bolster their credibility on direct examination. Otherwise, in practically all cases, bolstering evidence would automatically be allowed, as credibility is typically at issue when a defendant claims actual innocence while the victims and other witnesses provide evidence that the crime in fact occurred.

Additionally, even had Alderson attacked the girls' credibility in his opening statement, we disagree with the Commonwealth's implied premise that this would justify rehabilitation by any means. Victim impact testimony is *not* appropriate for bolstering credibility. Instead, another method of bolstering credibility could have been used.

A vigorous defense was provided in this case, with Alderson testifying and denying he engaged in any inappropriate conduct with the girls. Because there was a lack of any physical evidence, the perception of the girls as victims who were suffering long-term damage would arouse the jurors' sympathy and could result in a verdict rooted in that sympathy rather than based on the evidence properly admitted.

K.M. testified that after the assault she had to go to therapy, take sleeping pills to combat recent night terrors, feared male family members, had flashbacks and went to the counselor's office to recuperate, once people found

15

out they treated her differently, she could not visit A.A.'s house because it was the crime scene, and she is scared all of the time. K.M.'s testimony was devoted to her own recitation of her emotional state and how she had suffered *since reporting* the assault. As such, this testimony had little relevancy as to whether the crime had in fact occurred and at least some of what she described could be the result of the criminal process itself or other people learning about the assault. Admitting such evidence at this stage of the trial had little relevance and even if relevant was clearly more prejudicial than probative and could mislead the jury as to what were appropriate bases for finding guilt.

Similarly, while the victim impact testimony from the other girls was not as devastating as K.M.'s statement, the picture they formed for the jury was highly inflammatory and only added to the problematic nature of what had been allowed as to K.M. The aftereffects A.R. testified to were that she cannot trust, is now uncomfortable, had difficulty being in A.A.'s house *after reporting* the incident, her grades declined, she had to go on medicine, and she couldn't sleep. R.D. indicated that she is now uncomfortable and scared around people.

Allowing repeated and extensive victim impact testimony in the guilt phase was a serious and glaring error. Such testimony was not background evidence, was premature as the girls' credibility had not been attacked yet (and in any event would have been inappropriate for bolstering their credibility) and was not relevant to establish the underlying crime. There is no acceptable justification whatsoever for admitting victim impact testimony at this phase of

16

the criminal trial and this error impacted Alderson's substantial rights. Therefore, reversal is required for a new trial.

**B.    Granting a directed verdict on the rape count involving R.D. being "physically helpless" but then allowing the Commonwealth to amend the indictment to rape by "forcible compulsion" was technically improper but harmless as the amendment did not prejudice Alderson.—Preserved**

During the trial, after the Commonwealth completed its case, Alderson moved for a directed verdict on the rape of R.D. as the evidence did not show she was "physically helpless." He explained R.D.'s testimony was that she had awoken to Alderson pulling her pants down, with the penetration occurring *after* she was awake.

The trial court agreed that a directed verdict should be granted on that basis but instructed the Commonwealth Attorney to file a motion to amend that count of the indictment to forcible compulsion as that was a better fit with the evidence, stating the court would grant such an amendment. A written motion and an order to that effect were filed and entered that day.

RCr 6.16 provides:

> The court may permit an indictment, information, complaint or citation to be amended any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced. If justice requires, however, the court shall grant the defendant a continuance when such an amendment is permitted.

Alderson argues the trial court abused its discretion in allowing for this amendment because it had already sustained the directed verdict as to R.D. not being physically helpless and, thus, could not order this count amended,

17

relying on *Blane v. Commonwealth*, 364 S.W.3d 140, 150-51 (Ky. 2012), *abrogated on other grounds by Roe v. Commonwealth*, 493 S.W.3d 814 (Ky. 2015). Alderson emphasizes he could not be guilty of the original count based on R.D.'s testimony that she woke up and said "no" prior to the penetration. He argues that amending the indictment was inappropriate because it was presenting a completely new theory of the case, even though R.D.'s testimony was consistent with her disclosure to Lotus which had been produced for him, because the defense had prepared its case on the theory of the specific format of rape that was charged. Alderson argues that under the circumstances he was prejudiced by the amendment as it was made after R.D. testified and "[h]aving been tasked with defending four counts of various sexual offenses involving three different girls, it was an insurmountable task for the defense to have to switch gears and defend one count under a forcible compulsion theory and three counts under the physically helpless theory."

Accordingly, Alderson argues the trial court lacked jurisdiction over the subject matter of the offense, had no authority to submit the instruction to the jury, allow it to return a verdict on such a theory, or sentence him for it. He concludes that his rights were violated under the federal and Kentucky constitution and his conviction must be reversed and dismissed with prejudice as double jeopardy bars retrial of this count.

We disagree. *Blane* involved an amendment to an "additional or different offense" of trafficking in greater than eight ounces of marijuana, KRS 218A.1421(3), after a directed verdict had been granted to the original offense

18

of trafficking in a controlled substance within 1,000 yards of a school, KRS 218A.1411. *Blane*, 364 S.W.3d at 150-51. The original offense did not require a specific quantity of marijuana be involved under the definition provided for "traffic" in KRS 218A.010(56). Therefore, not only was it a different KRS number, but also was truly a different crime.

In contrast, first-degree rape allows for conviction through either engaging in sexual intercourse with someone "by forcible compulsion" or with someone "who is incapable of consent because [that person] . . . '[i]s physically helpless[.]' " KRS 510.040(1). Thus, the amendment did not constitute a change in the charge itself, only the circumstances regarding how it was committed.

Since *Blane*, *Justice v. Commonwealth*, 636 S.W.3d 407, 411-12 (Ky. 2021), *abrogated on other grounds by Sexton v. Commonwealth*, 647 S.W.3d 227, 232 (Ky. 2022), was decided. In *Justice*, the Court distinguished *Blane* and agreed with the Commonwealth that it was appropriate to amend the indictment to conform to the evidence adduced at trial, to dismiss the charge of rape and submit the case to the jury on the lesser-included offense of attempted rape as the Commonwealth's case amply supported this change without the introduction of any additional evidence, the amendment was permitted by RCr 6.16, did not name a new or additional offense, and importantly "Justice's defense—a complete denial of any sexual contact with the victim—was not prejudiced." *Justice*, 636 S.W.3d at 412. The Court acknowledged that pursuant to its ruling in *Blane*, although "the trial court erred by failing to have unequivocally withdrawn the directed verdict and then

19

considered amending the indictment to allow for a lesser-included offense, the error is harmless because Justice suffered no prejudice by defending against a lesser-included offense of the originally indicted charge." *Justice*, 636 S.W.3d at 412.

Whether an amendment of an indictment during a trial to allow for a different method of committing the same crime is permissible, is a highly fact-specific inquiry depending on the evidence available to the defendant, the defenses offered and whether the defendant would be prejudiced (beyond the "prejudice" of not being wholly relieved from having to defend against a charge at all). In *Wolbrecht v. Commonwealth*, 955 S.W.2d 533, 537-38 (Ky. 1997), an amendment during the trial did cause prejudice because it radically changed the nature of the crime; originally the appellants were indicted for being principals and accomplices to a murder, but as amended none of the defendants had committed the murder and had instead solicited an unnamed and unknown person to kill the victim. The appellants could not adequately defend against this charge because their defense had focused on establishing alibis, and it was fundamentally unfair to deny them a continuance to investigate and refute the additional accusations. In contrast, in *Commonwealth v. Combs*, 316 S.W.3d 877, 879-80 (Ky. 2010), an amendment before trial from trafficking to complicity to trafficking was appropriate because complicity was not an additional or different offense; the essential facts remained the same and the appellant was aware of the person he was to have

been complicit with because the appellant had subpoenaed her to testify at the trial.

While the trial court should have followed the appropriate method of amending Alderson's indictment, rather than dismissing the charge and then allowing the indictment to be amended, this error was harmless because Alderson was not thereby prejudiced. Alderson was aware from the disclosures provided to him from R.D.'s Lotus interview that R.D. stated she was awake and saying "no" before the rape occurred and the indictment was still for first-degree rape. His denial of any untoward behavior regarding R.D. did not need any alteration to equally defend against this alternative method of how the rape occurred. Additionally, Alderson failed to request a continuance, which belies his current argument that he could not adequately defend against the amended charge. Therefore, no prejudice was established in allowing the amendment and this count need not be dismissed with prejudice. Given that we are reversing and remanding on another issue, Alderson will have a new opportunity to prepare for and present whatever defense he wishes to this amended charge.

**C.** **Denying the motion for separate trials as to each victim did not violate Alderson's right to due process because evidence as to each crime would have properly been admissible pursuant to Kentucky Rules of Evidence (KRE) 404(b) had separate trials taken place.—Preserved**

On October 11, 2021, Alderson filed a motion for separate trials, arguing that none of the girls were witnesses to the others' allegations and he would be prejudiced pursuant to RCr 8.31 because the joint trials would allow

21

inadmissible character evidence against him to be admitted. The Commonwealth Attorney countered that joinder was appropriate because the offenses were of the same or similar character, Alderson's behavior demonstrated a recurring pattern, Alderson engaged in a signature crime with a discernable *modus operandi*, and even if the trials were separate that evidence of the crimes Alderson committed against all the girls would thereby be admissible.

After a hearing, the trial court agreed with the Commonwealth and denied Alderson's motion, opining it was not prejudicial to Alderson to have one trial because if there were separate trials the evidence regarding the other crimes could still be admitted "to show opportunity, intent, preparation and plan" but not identity because everyone knew who he was. The trial court explained that Alderson "scoped" the girls out, waited until they were asleep, kept going back and prepared for assaulting them while they were vulnerable.

Alderson then suggested that a partial cure could be had through an admonition. The trial court gave the jury the admonition that Alderson suggested in the jury instructions:

> Offenses to be Considered Separately
>
> The Defendant has been charged with multiple offenses. You should consider each offense separately. You must return a not guilty verdict as to any offense for which you have reasonable doubt that the Commonwealth has proven every element beyond a reasonable doubt.

Alderson argues he was denied his right to due process by having to defend against all the charges together and was prejudiced in having

22

inadmissible character evidence admitted when none of the KRE 404(b) exceptions applied. He also argues it was unfair to allow the girls' testimony to bolster one another when they had no personal knowledge of the charges involving each other. In support of his bolstering argument, he points to the Commonwealth Attorney's closing argument in which it was argued that multiple instances of the same crime provided support for the fact that they had occurred.

While Alderson acknowledges that joinder can be permitted pursuant to RCr 6.18, if the crimes are of the same or similar character, or part of a common scheme or plan, he argues that pursuant to RCr 8.31, the trials should have been severed because having the offenses joined prejudiced him. In support of this argument, he relies on *Peacher v. Commonwealth*, 391 S.W.3d 821, 837-38 (Ky. 2013), in which reversal was granted for not severing the crimes of murder against one child and a criminal abuse charge against another where both children were left in Peacher's care, but there was not a common scheme or plan behind his actions toward them.

Alderson argues he was prejudiced because the evidence as to the other assaults and rapes would have been inadmissible had the trials been severed. Alderson specifically denies that the evidence showed he had a plan as the specifics of how all the alleged illegal encounters played out differed with each of the girls.

If the evidence presented at trial regarding Alderson's conduct toward the girls would have been admissible during separate trials under KRE 404(b), he

23

cannot establish prejudice in being denied his motion to sever the trials. *Newcomb v. Commonwealth*, 410 S.W.3d 63, 73 (Ky. 2013). KRE 404(a) provides a prohibition on using the evidence of a person's character or trait of character "for the purpose of proving conformity therewith[.]" KRE 404(b) provides that while "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" that it may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]"

As noted in *Clark v. Commonwealth*, 223 S.W.3d 90, 96 (Ky. 2007), "that list of exceptions is illustrative, not exhaustive." Evidence of prior sexual misconduct can be

> offered to show a modus operandi for the purpose of proving motive, intent, knowledge, and the absence of mistake or accident, *i.e.,* contrary to his statements to the police, Appellee knew what he was doing (knowledge), he did it on purpose (intent, absence of mistake or accident), and he did it for his own sexual gratification (motive).

*Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

> [T]o prove the elements of a subsequent offense by evidence of modus operandi, the facts surrounding the prior misconduct must be so strikingly similar to the charged offense as to create a reasonable probability that (1) the acts were committed by the same person, and/or (2) the acts were accompanied by the same *mens rea.*

*Id.* Conduct that is a necessary element to establish the crime, such as the victims' ages and the type of sexual contact involved "is not strong evidence of a distinct pattern of conduct sufficient to meet the modus operandi exception."

24

*Clark*, 223 S.W.3d at 98. "Instead, the modus operandi exception is met only if the conduct that meets the statutory elements evidences such a distinctive pattern as to rise to the level of a signature crime." *Id.*

*Newcomb* and *English* are more closely analogous to Alderson's situation than *Peacher*. In *Newcomb*, two rape offenses were joined and this joinder was upheld based on Newcomb having a common *modus operandi* in committing rape against the two women even though some of the specifics of the rapes varied. As to each woman, Newcomb had a similar, pre-existing relationship but had not been romantically involved with them, they were the same gender, race and approximate age, with the attacks beginning and continuing in a similar manner. *Newcomb*, 410 S.W.3d at 75. While the Court pointed out that there were some differences between the attacks, it did not think those differences were dispositive. *Id.* at 76. The Court also emphasized that while "reasonable minds can differ on whether the two attacks are so strikingly similar as to demonstrate a modus operandi[,]" such a determination was within the trial court's broad discretion so long as there was not a clear abuse of that discretion and prejudice. *Id.* at 77. Additionally, it rejected Newcomb's assertion that the credibility of the victims was unfairly bolstered by the joinder, explaining that "this prejudice is inherent in the joinder of all offenses and is not undue prejudice."[2] *Id.*

---

[2] However, because of this inherent prejudice, trial courts must be especially cognizant that they should not allow the defendant to be prejudiced further by letting in improper bolstering evidence, as the nature of the joint trial has already bolstered the complaining witnesses' credibility.

25

Similarly, in *English*, 993 S.W.2d at 945, *modus operandi* evidence was proper based on sufficient similarity of facts:

> In each instance, the victim was a prepubescent female relative of Appellee's wife. In fact, the familial relationship with each victim was the same, except for the generational gap. Each incident occurred while the victim was a visitor in Appellee's home and either on a couch or in a chair, presumably in a living room area as opposed to, *e.g.,* a bedroom. Each incident occurred while Appellee's wife was also present in the home. Finally, each incident consisted of Appellee touching the victim's vaginal area.

While certain specifics may have varied, such as whether the assaults occurred in A.A.'s room or the living room, and that A.R. woke up before Alderson penetrated her, the key *modus operandi* conduct was that Alderson only committed these alleged crimes when his sister was having a sleepover with her friend at the family home, with Alderson beginning to violate each fourteen- or fifteen-year-old while she was asleep, wherever each was sleeping in the house, while other family members were also sleeping nearby. These incidents happened close in time with one another over a span of less than four months. While the level of violation varied, such violation was consistent as being only a matter of degree with Alderson consistently using his fingers (rather than any other body part or instrument) to touch or penetrate the girls' vaginas. The fact that he desisted with two of the girls when they demonstrated they were awake and was not dissuaded when the final victim, R.D., awoke, is not enough to make these acts distinct enough to require separate trials. We also are confident that had separate trials been granted, the evidence of the other assaults and rapes would have nevertheless been admissible pursuant to KRE 404(b). As was the case in *Newcomb,*

26

> [g]iven the probative value of the strikingly similar crimes, we cannot say that the prejudice to [Alderson in having a joint trial] was unreasonable or unnecessary. So the trial court did not abuse its discretion by joining the offenses where the evidence would have been mutually admissible in separate trials and [Alderson] alleges only the type of prejudice attendant with all joinder of offenses.

*Newcomb*, 410 S.W.3d at 78. Therefore, a joint trial will again be allowed on remand.

### D. The ruling that Alderson could not refresh the girls' testimony with prior inconsistent statements without opening the door to the admission of the entirety of their video statements to Lotus was incorrect.—Preserved

Testimony from K.M., R.D. and their Lotus interviewer, Nicole Wadley, was inconsistent in some details from what was recorded that K.M. and R.D. reported to Wadley and the police, with the witnesses either not recalling certain things or remembering and testifying about them differently from what had been recorded. Alderson proposed to refresh the witnesses' memories by showing them a portion of their Lotus interviews. The Commonwealth Attorney objected to allowing a portion of any video to be played without admitting the whole video, noting that the girls may have clarified earlier statements later in their interviews.

The trial court opined that if Alderson used a document or a video, he would be "opening the door" to its admittance and stated that a recorded statement or video would be the best evidence of what the witness said before. The defense responded that it had no intention of introducing any portion of the videos into evidence.

27

The trial court opined that the videos and transcripts of statements were the "best evidence" of what occurred. The trial court concluded that if the defense showed part of the videos or the transcripts that the defense "opened the door" and that it had no intention of allowing the defense to buttress its questions with these materials without the jury seeing the entire source material because given the girls' ages, they communicate differently than adults. The trial court concluded by clearly stating, "That's my ruling."

The defense opted to "not take the chance" that the girls' entire Lotus interviews would thereby be admissible and chose not to question these witnesses about these inconsistent statements during the defense case in chief. Instead, the defense asked to have the opportunity to proffer the testimony by avowal outside the viewing of the jury, and the trial court granted that motion, indicating it was appropriate for Alderson to do that to preserve the error.

Alderson argues that the trial court's ruling violated his constitutional right under the due process clause to present his defense through questioning these witnesses about prior inconsistent statements and abused its discretion in doing so. He argues it was appropriate under KRE 612 to use prior statements to refresh the witnesses' recollection and using statements from the Lotus video did not open the door to introducing the entire one- and one-half hour videos of R.D. and K.M. Instead, if he were to use portions of those videos, under KRE 106 what the Commonwealth could introduce was only the further portion which ought to be considered contemporaneously with it, not the entire video which would just be prior consistent statements. Alderson argues he was

28

prejudiced by not being able to show the jury that R.D. initially denied he had assaulted her and not being able to show the other inconsistencies in the testimony.

The Commonwealth argues that Alderson did not appropriately preserve this issue as he "could have impeached the juvenile victims with their prior inconsistent statements if he so chose, [but] he simply declined to do so for tactical reasons." The Commonwealth argues that Alderson should have proceeded with his impeachment, and if the trial court had then allowed the Commonwealth to play some or all of the Lotus interviews over his objection, then the issue would have been preserved, and otherwise, any claimed error can only be reviewed under the palpable error review standard.

As we are reversing on another issue, we address this issue only to provide guidance on remand. We disagree that Alderson did not sufficiently preserve this issue, where the trial court made a clear ruling about what it would do after Alderson appropriately explained his position. While the extent to which the trial court would have allowed the playing of the Lotus interview was unknown, it was known that the trial court would have allowed at least part of it to be played while Alderson argued none of it should be played, and through avowal Alderson established what the witnesses' testimony would have been.

The trial court was simply incorrect in its conclusion that Alderson could not use the Lotus interview to refresh the witnesses' recollections without the underlying materials being presented as evidence to the jury. As was clarified

29

in *Brock v. Commonwealth*, 947 S.W.2d 24, 30 (Ky. 1997), it is appropriate to use a tape recording of a conversation (and ostensibly also a video recording) to refresh a witness's recollection. However, "any attempt to impeach or refresh the recollection of a witness with a tape recorded statement must be conducted first in chambers outside the hearing of the jury so that the jury will not be prejudiced by having heard the recording in the event it is determined to be inadmissible." *Id.* at 31. Similarly, a writing used "to refresh a witness's recollection per KRE 612 . . . 'cannot be read [aloud] under the pretext of refreshing the witness's recollection.'" *Fisher v. Commonwealth*, 620 S.W.3d 1, 15 (Ky. 2021) (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 3.20[6][c] (on KRE 612) (2020) (citing *Payne v. Zapp*, 431 S.W.2d 890, 892 (Ky. 1968))).

"[W]hen a witness refreshes her memory under [KRE 612], the testimony elicited thereafter 'is the product of the refreshed memory, not the writing [or recording] used to refresh it.' As a result, the document [or recording] itself is not admissible into evidence[.]" *Martin v. Commonwealth*, 456 S.W.3d 1, 15 (Ky. 2015), (quoting *Berrier v. Bizer*, 57 S.W.3d 271, 277 (Ky. 2001)) (*abrogated on other grounds by Sexton*, 647 S.W.3d at 232). *See also Disabled American Veterans, Dept. of Kentucky, Inc. v. Crabb*, 182 S.W.3d 541, 551-52 (Ky. App. 2005) (relying upon and quoting from Lawson, *The Kentucky Evidence Handbook*, 3.20[2], [7], and § 8.85[1] (4th ed.2003) for the propositions that almost any writing can be used to refresh a tarnished memory, but such writing does not become evidence, as the refreshed memory is the evidence).

30

If refreshment is unsuccessful, and instead a witness is impeached with her prior inconsistent statement, that is a different matter.

> Under KRE 801A(a)(1), relating to prior statements of witnesses, "[a] statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is ... [i]nconsistent with the declarant's testimony[.]" An inconsistent statement for purposes of KRE 801A(a)(1) includes a witness's claimed inability to recall making the statement. *McAtee v. Commonwealth*, 413 S.W.3d 608, 618 (Ky. 2013). And under Kentucky law, "prior inconsistent statements may be introduced as an impeachment device *and* as substantive evidence." *Id.*

*Downs v. Commonwealth*, 620 S.W.3d 604, 617 (Ky. 2020).

If a portion of a Lotus recording was admitted into evidence pursuant to KRE 801A(a)(1), the question would then become whether other portions of that interview would then need to be admitted into evidence pursuant to KRE 106, which provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." As explained in *James v. Commonwealth*, 360 S.W.3d 189, 205 (Ky. 2012), and *Meece v. Commonwealth*, 348 S.W.3d 627, 671 (Ky. 2011), this does not "open the door" to entire videos being admitted into evidence. Instead, it must be resolved whether the portions of the videos admitted would be misleading or altered by

31

the exclusion of other portions of the videos and, if so, what other portions of the videos thereby ought to also be admitted into evidence.[3]

### E. The trial court erred when it imposed jail fees without evidence of a jail fee reimbursement policy.—Unpreserved

The trial court entered an order requiring Alderson to pay a jail fee, stating that "Ballard County had adopted a jail fee ordinance pursuant to applicable statute." Alderson argues that the trial court erred in imposing such a fee "because it is unclear when or how the Ballard County jail adopted a jail fee reimbursement policy pursuant to KRS 441.265(2)(a)" and, therefore, reversal of the imposition of this fee is warranted.

Alderson concedes this issue is unpreserved, but correctly states that because sentencing is jurisdictional, a failure to object cannot waive sentencing errors, which may properly be raised for the first time on appeal. *Travis v. Commonwealth*, 327 S.W.3d 456, 459 (Ky. 2010).

Pursuant to *Capstraw v. Commonwealth*, 641 S.W.3d 148, 161-62 (Ky. 2022), "in order to impose jail fees against a criminal defendant during sentencing, there must be *some evidence* presented that a jail fee reimbursement policy has been adopted by the county jailer with approval of

---

[3] We acknowledge it may be more difficult to easily assert which portions of a video should be presented contemporaneously for completeness in such circumstances. Videos may need to be reviewed in real time to make such a determination, while a transcript or statement could quickly be skimmed. However, that does not provide a valid basis for simply admitting the entirety of these videos. The solution in such a situation, while cumbersome, is to allow the party seeking to admit additional portions of the videos to review the videos and then mark and explain what portions of necessity should also be admitted, thus allowing for discussion and resolution.

the county's governing body in accordance with KRS 441.265(2)(a)." (Emphasis added).

The Commonwealth argues there is "some evidence" that Ballard County properly adopted a jail fee ordinance because the trial court's order stated: it had been advised that Ballard County adopted a jail fee, the rate of $22.00 per day was established prior to July 1, 2021, and the rate of $30.00 per day became effective July 1, 2021. We disagree that the trial court simply stating this constitutes "some evidence." Instead, it is clear in *Capstraw* that some evidence was lacking if "there was no such evidence *presented during . . . sentencing*[.]" 641 S.W.3d at 162 (emphasis added).

Therefore, should Alderson be convicted again on remand, appropriate evidence as to the proper adoption of a jail fee should be presented during sentencing. This could be as simple as the Commonwealth Attorney providing a copy of the relevant ordinances.

## IV. CONCLUSION

Accordingly, we reverse Alderson's conviction and sentence by the Ballard Circuit Court and remand for a new trial.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Thomas A. Van De Rostyne
Assistant Attorney General